AMY JEANNE CONWAY *v.* TOWN OF WILTON ET AL.
(15335)

Peters, C. J., and Callahan, Borden, Katz and Palmer, Js.

Argued June 6—officially released August 6, 1996

*David T. Grudberg*, with whom, on the brief, was *Ira B. Grudberg*, for the appellant (plaintiff).

*Raymond J. Plouffe, Jr.*, with whom, on the brief, was *Kevin S. Coyne*, for the appellees (named defendant et al.).

*Hugh W. Cuthbertson*, with whom was *Dana Shaw MacKinnon*, for the appellee (defendant Connecticut Association of Secondary Schools).

*Mary-Michelle U. Hirschoff* filed a brief for the Connecticut Conference of Municipalities et al. as amici curiae.

*William F. Gallagher* and *Kurt D. Koehler* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

KATZ, J. In *Manning* v. *Barenz*, 221 Conn. 256, 603 A.2d 399 (1992), this court held that municipalities and their employees are "owners" under General Statutes § 52-557f (3) and are, therefore, entitled to immunity from liability for injuries sustained on land available to the public for recreational purposes. Today, we reconsider *Manning*, conclude that it was not properly decided and, accordingly, overrule it.

The following facts are undisputed. The plaintiff, Amy Jeanne Conway, brought this action against the town of Wilton (town), David Dixon, the parks and recreation director for the town, and the Connecticut Association of Secondary Schools (association)[1] for personal injuries sustained while participating in a state high school tennis tournament sponsored by the association on premises owned by the town. The plaintiff alleged that on June 9, 1986, the Connecticut Interscholastic Athletic Conference (conference)[2] held a championship tennis tournament for high school girls at the Wilton High School tennis courts. No fee had been charged for the use of the tennis courts. The plaintiff further alleged that, while competing in the tournament, she fell as a result of a defect in the courts and sustained serious injuries to her knee and ankle. Additionally, the plaintiff alleged that the proximate cause of her injuries was the negligence of Dixon and his staff in maintaining the tennis courts, and the negligence of the association in failing to inspect the courts in order to ensure that the town repair any unsafe conditions and in failing to supervise the administration of the tournament.

The defendants moved for summary judgment claiming immunity under General Statutes § 52-557g, the immunity provision of the Connecticut Recreational

[1] The Connecticut Association of Secondary Schools is now named the Connecticut Association of Schools.

[2] The conference is an extension of the association that directs and controls athletic competition between the secondary schools of Connecticut.

Land Use Act (act), General Statutes § 52-557f et seq.[3] In her opposition to the association's motion, the plaintiff argued, inter alia, that the association "owed [her] an

[3] General Statutes § 52-557f provides: "As used in sections 52-557f to 52-557i, inclusive:

"(1) 'Charge' means the admission price or fee asked in return for invitation or permission to enter or go upon the land;

"(2) 'Land' means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty;

"(3) 'Owner' means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises;

"(4) 'Recreational purpose' includes, but is not limited to, any of the following, or any combination thereof: Hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, snow skiing, ice skating, sledding, hang gliding, sport parachuting, hot air ballooning and viewing or enjoying historical, archaeological, scenic or scientific sites."

Although the current revision of § 52-557f (4) includes specific activities under "recreational purpose" that were not included in the statute in 1986 when this action arose, the statute is otherwise the same.

General Statutes § 52-557g provides: "(a) Except as provided in section 52-557h, an owner of land who makes all or any part of the land available to the public without charge, rent, fee or other commercial service for recreational purposes owes no duty of care to keep the land, or the part thereof so made available, safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on the land to persons entering for recreational purposes.

"(b) Except as provided in section 52-557h, an owner of land who, either directly or indirectly, invites or permits without charge, rent, fee or other commercial service any person to use the land, or part thereof, for recreational purposes does not thereby: (1) Make any representation that the premises are safe for any purpose; (2) confer upon the person who enters or uses the land for recreational purposes the legal status of an invitee or licensee to whom a duty of care is owed; or (3) assume responsibility for or incur liability for any injury to person or property caused by an act or omission of the owner.

"(c) Unless otherwise agreed in writing, the provisions of subsections (a) and (b) of this section shall be deemed applicable to the duties and liability of an owner of land leased to the state or any subdivision thereof for recreational purposes."

General Statutes § 52-557h provides: "Nothing in sections 52-557f to 52-557i, inclusive, limits in any way the liability of any owner of land which otherwise exists: (1) For wilful or malicious failure to guard or warn against a dangerous condition, use, structure or activity; (2) for injury suffered in any case where the owner of land charges the person or persons who enter

affirmative duty of care to choose a safe place for the tournament to be held and otherwise to properly run a safe event . . . and . . . it breached [that duty] when it brought her to the defective courts." The trial court granted the defendants' motions for summary judgment on the ground that they were immune from liability pursuant to the act.

On appeal to the Appellate Court, the plaintiff claimed that "the trial court improperly granted the motions for summary judgment because (1) the act as applied to the plaintiff violates article first, § 10, of the Connecticut constitution, (2) the association owed a duty to the plaintiff that is independent of the act, and (3) Dixon and the town failed to make the premises 'available to the public,' and, therefore, are not entitled to statutory immunity." *Conway* v. *Wilton*, 39 Conn. App. 280, 282–83, 664 A.2d 327 (1995). The Appellate Court rejected all three claims. Id., 285–89. The plaintiff also claimed that *Manning* v. *Barenz*, supra, 221 Conn. 256, should be overruled. Because the Appellate Court cannot overrule a Supreme Court decision, it declined to review that claim. *Conway* v. *Wilton*, supra, 283 n.5.

Thereafter, the plaintiff petitioned this court for certification to appeal, which we granted, limited to the following questions: (1) "Should this court reconsider its holding in *Manning* v. *Barenz*, [supra, 221 Conn. 256], that the recreational land use statute, General

___

or go on the land for the recreational use thereof, except that, in the case of land leased to the state or a subdivision thereof, any consideration received by the owner for the lease shall not be deemed a charge within the meaning of this section."

General Statutes § 52-557i provides: "Nothing in sections 52-557f to 52-557i, inclusive, shall be construed to relieve any person using the land of another for recreational purposes from any obligation which he may have in the absence of said sections to exercise care in his use of such land and in his activities thereon, or from the legal consequences of failure to employ such care."

Statutes § 52-557f et seq., applies to municipalities?" and (2) "If the answer to the first question is no, did the Appellate Court improperly conclude that the trial court was correct in rendering summary judgment in favor of the defendant Connecticut Association of Secondary Schools [association], where the plaintiff claimed that [the association] owed a duty to the plaintiff independent of any duty it may have owed as an 'owner of land' within the meaning of the recreational land use statute?" *Conway* v. *Wilton*, 235 Conn. 934, 934–35, 667 A.2d 1271 (1995).

We begin with the rule of stare decisis.[4] This court has repeatedly acknowledged the significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law.[5] *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 196, 676 A.2d 831 (1996). Stare decisis is "a formidable obstacle to any court seeking to change its own law." C. Peters, "Foolish Consistency: On Equality, Integrity, and Justice in Stare Decisis," 105 Yale L.J. 2031, 2036 (1996). It "is the most important application of a theory of decisionmaking consistency in our legal culture" and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value. Id., 2037. Stare decisis does more than merely push courts in hard cases, "where they are not convinced about what justice requires, toward decisions that conform with decisions made by previous courts." Id., 2090. The doctrine is justified because it allows for predictability in the ordering of conduct, it promotes the necessary

[4] Black's Law Dictionary (6th Ed. 1990) defines stare decisis as "[t]o abide by, or adhere to, decided cases."

[5] Stare decisis plays an integral role in our legal culture and has been the subject of numerous commentaries. See, e.g., K. Llewellyn, "Case Law," in 3 Encyclopedia of the Social Sciences (E. Seligman ed., 1930) p. 249; R. Pound, "The Theory of Judicial Decision," 36 Harv. L. Rev. 940, 942–43 (1923); L. Powell, "Stare Decisis and Judicial Restraint," 47 Wash. & Lee L. Rev. 281, 286–87 (1990).

perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. A. Kronman, "Precedent and Tradition," 99 Yale L.J. 1029, 1038–39 (1990) ("respect for past decisions is desirable to the extent that it increases the sum of social welfare . . . by enhancing the law's predictability, economizing judicial resources, strengthening the prestige of legal institutions, etc.").

As this court has stated many times, "[t]he true doctrine of stare decisis is compatible with the function of the courts. . . . [T]here is no question but that [a] decision of this court is a controlling precedent until overruled or qualified. . . . [S]tare decisis . . . serve[s] the cause of stability and certainty in the law—a condition indispensable to any well-ordered system of jurisprudence . . . ." (Citations omitted; internal quotation marks omitted.) *White* v. *Burns*, 213 Conn. 307, 335, 567 A.2d 1195 (1990).

Whether stare decisis serves the interests of judicial efficiency, protection of expectations, maintenance of the rule of law, or preservation of judicial legitimacy, however, is not dispositive. The value of adhering to precedent is not an end in and of itself, however, if the precedent reflects substantive injustice. Consistency must also serve a justice related end. B. Cardozo, The Nature of the Judicial Process (1921) p. 150 (favoring rejection of precedent when it "has been found to be inconsistent with the sense of justice or with the social welfare"). When *a prior decision is "seen so clearly as error* that its enforcement [is] for that very reason doomed"; (emphasis added) *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833, 854, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992); the court should seriously consider whether the goals of stare decisis are outweighed, rather than dictated, by the prudential and pragmatic considerations that inform the doctrine to enforce a clearly erroneous decision.

Stare decisis is not an " 'inexorable command.' " Id. The court "must weigh [the] benefits [of stare decisis] against its burdens in deciding whether to overturn a precedent it thinks is unjust. The rule of stare decisis may entail the sacrifice of justice to the parties in individual cases, but, far from being immune from considerations of justice, it must always be tested against the ends of justice more generally." C. Peters, supra, 105 Yale L.J. 2047.

Indeed, this court has long believed that although " '[s]tare decisis is a doctrine developed by courts to accomplish the requisite element of stability in court-made law, [it] is not an absolute impediment to change. . . . [S]tability should not be confused with perpetuity. If law is to have a current relevance, courts must have and exert the capacity to change a rule of law when reason so requires. . . .' *In re Stranger Creek & Tributaries in Stevens County*, 77 Wash. 2d 649, 653, 466 P.2d 508 (1970)." *White* v. *Burns*, supra, 213 Conn. 335. " '[I]t is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations. Those doctrines only will eventually stand which bear the strictest examination and the test of experience.' *Barden* v. *Northern Pacific R. Co.*, 154 U.S. 288, 322, 14 S. Ct. 1030, 38 L. Ed. 992 (1894). The United States Supreme Court has said that when it has become 'convinced of former error,' it has 'never felt constrained to follow precedent.' *Smith* v. *Allwright*, 321 U.S. 649, 665, 64 S. Ct. 757, 88 L. Ed. 987 (1943), reh. denied, 322 U.S. 769, 64 S. Ct. 1052, 88 L. Ed. 1594 (1944)." *White* v. *Burns*, supra, 336.

"[One] well recognized exception to stare decisis under which a court will examine and overrule a prior decision . . . [is when that prior decision] is clearly wrong. . . . The doctrine [of stare decisis] requires a clear showing that an established rule is incorrect and

harmful before it is abandoned." (Citation omitted; internal quotation marks omitted.) *White* v. *Burns,* supra, 213 Conn. 335; see *Kluttz* v. *Howard,* 228 Conn. 401, 406, 636 A.2d 816 (1994) ("a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it" [internal quotation marks omitted]); *Herald Publishing Co.* v. *Bill,* 142 Conn. 53, 62, 111 A.2d 4 (1955) ("[a] court, when once convinced that it is in error, is not compelled to follow precedent"). Because "stare decisis is not a rule of law but a matter of judicial policy . . . it does not have the same kind of force in each kind of case so that adherence to or deviation from that general policy may depend upon the kind of case involved, especially the nature of the decision to be rendered that may follow from the overruling of a precedent." (Internal quotation marks omitted.) *Ozyck* v. *D'Atri,* 206 Conn. 473, 483, 538 A.2d 697 (1988) (*Healey, J.,* concurring).

"The arguments for adherence to precedent are least compelling, furthermore, when the rule to be discarded may not be reasonably supposed to have determined the conduct of the litigants . . . . *Hopson* v. *St. Mary's Hospital,* 176 Conn. 485, 496 n.5, 408 A.2d 260 (1979), quoting B. Cardozo, [supra] p. 151. . . . Rarely do parties contemplate the consequences of tortious conduct, and rarely if at all will they give thought to the question of what law would be applied to govern their conduct if it were to result in injury. W. Reese, 'Conflict of Laws and the Restatement Second,' 28 Law & Contemp. Prob. 679, 699 (1963); accord *Griffith* v. *United Air Lines, Inc.,* [416 Pa. 1, 23–24, 203 A.2d 796 (1964)]; *Wilcox* v. *Wilcox,* 26 Wis. 2d 617, 622, 133 N.W.2d 408 (1965); R. Sedler, 'The Governmental Interest Approach to Choice of Law: An Analysis and a Reformulation,' 25 U.C.L.A. L. Rev. 181, 230 (1977)." (Internal quotation marks omitted.) *O'Connor* v. *O'Connor,* 201 Conn. 632, 644–45, 519 A.2d 13 (1986) (refusal to adhere to lex loci delicti does

not defeat the legitimate prelitigation expectations of parties founded in reliance on our prior decisions).

Moreover, we have deemed it appropriate, in other contexts, to depart from common law precedents where we have found compelling reasons and logic for doing so. See *Ely* v. *Murphy*, 207 Conn. 88, 95, 540 A.2d 54 (1988) (in view of legislative determination that minors are incompetent to assimilate responsibly effects of alcohol and lack legal capacity to do so, their consumption of alcohol is not intervening act necessary to break chain of proximate causation and does not insulate one who provides alcohol to minors from liability for ensuing injury; overruled earlier rulings in *Slicer* v. *Quigley*, 180 Conn. 252, 429 A.2d 855 [1980], *Nelson* v. *Steffens*, 170 Conn. 356, 365 A.2d 1174 [1976], and *Moore* v. *Bunk*, 154 Conn. 644, 228 A.2d 510 [1967]); *Moore* v. *McNamara*, 201 Conn. 16, 25–34, 513 A.2d 660 (1986) (paternal duty of support of minor children); *O'Connor* v. *O'Connor*, supra, 201 Conn. 637 (where strict application of common law rule of lex loci delicti undermines important state policy, we refuse to apply it). We have also overruled precedent interpreting a statute even when the legislature has had numerous occasions to reconsider that interpretation and has failed to do so. *Chairman* v. *Freedom of Information Commission*, 217 Conn. 193, 201, 585 A.2d 96 (1991).

In short, consistency must not be the only reason for deciding a case in a particular way, if to do so would be unjust. Consistency obtains its value best when it promotes a just decision. In this case, consistent with the proper performance of our judicial function, we, therefore, reexamine the challenged precedent.

In *Manning* v. *Barenz*, supra, 221 Conn. 260, this court held, on the basis of what we determined to be the clear and unambiguous language of § 52-557f (3), that the defendant municipality was an owner within

the meaning of that statute because it "possesse[d] the fee interest in the park in question." Having determined that the language was clear and unambiguous, the court saw "no need to resort to the legislative history." Id., 260 n.3. Although we acknowledged the Appellate Court's discussion of the legislative history of the act in *Genco* v. *Connecticut Light & Power Co.*, 7 Conn App. 164, 508 A.2d 58 (1986), wherein that court applied the act to a private property owner, we concluded that the clear and unambiguous language of the act provided for its application to governmental property owners as well as to private property owners. *Manning* v. *Barenz*, supra, 260 and n.3. Thereafter, in *Scrapchansky* v. *Plainfield*, 226 Conn. 446, 450, 454, 627 A.2d 329 (1993), a majority of this court examined whether, under the facts of that case, the defendant municipality had made the land "available to the public" as contemplated by § 52-557g and whether a league baseball game was a "recreational purpose" as contemplated by § 52-557f (4). The plaintiff in *Scrapchansky* did not ask this court to reexamine the decision in *Manning* that municipalities were owners within the meaning of § 52-557f (3), and the dissent, sua sponte, raised the issue and concluded that the act was not intended to apply to municipalities. Id., 461 (*Katz, J.,* dissenting). We now reconsider *Manning* and overrule it.

"Our analysis of the plaintiff's claims is guided by well established tenets of statutory construction. [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *M. DeMatteo Construction*

*Co.* v. *New London,* 236 Conn. 710, 714–15, 674 A.2d 845 (1996); see *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184,* 237 Conn. 114, 120, 676 A.2d 825 (1996); *State* v. *Burns,* 236 Conn. 18, 22–23, 670 A.2d 851 (1996); *State* v. *Spears,* 234 Conn. 78, 86–87, 662 A.2d 80, cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995). "Furthermore, [w]e presume that laws are enacted in view of existing relevant statutes; *Pollio* v. *Planning Commission,* 232 Conn. 44, 55, 652 A.2d 1026 (1995); *Kinney* v. *State,* 213 Conn. 54, 65, 566 A.2d 670 (1989) [cert. denied, 498 U.S. 898, 111 S. Ct. 251, 112 L. Ed. 2d (1990)]; *Shortt* v. *New Milford Police Dept.,* 212 Conn. 294, 302, 562 A.2d 7 (1989); and that [s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law. . . . *In re Valerie D.,* 223 Conn. 492, 524, 613 A.2d 748 (1992)." (Internal quotation marks omitted.) *M. DeMatteo Construction Co.* v. *New London,* supra, 715.

"Use of these tools of construction in this case suggests that the immunity conferred by the act was the carrot that legislators dangled before private landowners to encourage them to make their property available for public recreation . . . [and] that the decision by this court [in *Manning*] to include municipalities within the act's definition of owner is not consistent with the true legislative intent and, in effect, bestows a benefit on government never contemplated." *Scrapchansky* v. *Plainfield,* supra, 226 Conn. 462 (*Katz, J.,* dissenting).

At first glance the term "owner," which is defined as "the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises"; General Statutes § 52-557f (3); is not opaque. Indeed, we concluded in *Manning* v. *Barenz,* supra, 221 Conn. 260, that the clear and unambiguous meaning of that term encompassed municipal property owners. Nevertheless, upon closer scrutiny of this issue, we conclude

that an ambiguity arises in the application of the statute to municipalities. *State* v. *Cain*, 223 Conn. 731, 744–45, 613 A.2d 804 (1992) (ambiguity in statute may be found not only in literal text of language itself, but in application of that language to particular facts of case at issue). Specifically, the ambiguity in this seemingly unambiguous language becomes apparent when, in deciding whether "owner" applies to a municipality, the legislative history and public policy underlying the statute are considered.

Moreover, consideration of related statutory provisions, General Statutes §§ 52-557g (c) and 52-557h (2), reveals additional ambiguity on the subject of land owned or controlled by public entities. Section 52-557g (c) grants immunity to an owner who leases land to the state, absent written agreement to the contrary. Section 52-557h (2), although creating an exception to immunity coverage for owners who charge persons entering on the land for recreational purposes, also provides that consideration received for land leased to the state or a subdivision thereof shall not be deemed a charge within the meaning of the section. See footnote 3. By carving out different rules for lands leased to the state or its subdivisions, the statutes suggest that the legislature did not intend public and private "owners" to be treated identically under the statute.

"When application of the statute to a particular situation reveals a latent ambiguity in seemingly unambiguous language . . . we turn for guidance to the purpose of the statute and its legislative history to resolve that ambiguity." *University of Connecticut* v. *Freedom of Information Commission*, 217 Conn. 322, 328, 585 A.2d 690 (1991). We begin to ascertain the legislative intent by examining the statute in the context of the particular social problems it seeks to address. " 'Identifying the societal problems which the legislature sought to address may be particularly helpful in determining the

true meaning of the statute.' *State* v. *Parmalee,* 197 Conn. 158, 161–62, 496 A.2d 186 (1985). More and more Americans were participating in an expanding range of outdoor recreational activities. Overpopulation and increased leisure time had strained existing public recreation areas. State and municipal governments were struggling to locate alternative resources to accommodate increasing demand for recreational property. One such alternative under consideration was the utilization of privately owned land for public recreation. G. Thompson & M. Dettmer, 'Trespassing on the Recreational User Statute,' 61 Mich. B.J. 726, 727 (1982).

"As part of its attempt to foster availability of private land for public recreational use, the Connecticut legislature created a vehicle to increase public access to private property. Parroting a model act promulgated in 1965 by the Council of State Governments,[6] the Connect-

---

[6] "The model act provided in part:

" 'PUBLIC RECREATION ON PRIVATE LANDS: LIMITATIONS ON LIABILITY . . .

" 'Section 1. The purpose of this act is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.

" 'Section 2. As used in this act:

" '(a) "Land" means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty.

" '(b) "Owner" means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises.

" '(c) "Recreational purpose" includes, but is not limited to, any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites.

" '(d) "Charge" means the admission price or fee asked in return for invitation or permission to enter or go upon the land.

" 'Section 3. Except as specifically recognized by or provided in Section 6 of this act, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes.

" 'Section 4. Except as specifically recognized by or provided in Section

icut legislature enacted General Statutes §§ 23-27a through 23-27k, entitled 'An Act Limiting the Liability of Property Owners Toward Persons Using Their Land for Recreation,' in 1967.[7] See G. Thompson & M. Dettmer, supra, [61 Mich. B.J. 726–27]. This precursor to the Recreational Land Use Act was intended to target an underutilized resource. 'The intention of the act is to encourage the farmer, the party who has hundreds of thousands of acres to invite the public in to make use of the land without having [the] liability that they

6 of this act, an owner of land who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby:

" '(a) Extend any assurance that the premises are safe for any purpose.

" '(b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.

" '(c) Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of such persons.

" 'Section 5. Unless otherwise agreed in writing, the provisions of Sections 3 and 4 of this act shall be deemed applicable to the duties and liability of an owner of land leased to the state or any subdivision thereof for recreational purposes.

" 'Section 6. Nothing in this act limits in any way any liability which otherwise exists:

" '(a) For willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity.

" '(b) For injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof, except that in the case of land leased to the state or a subdivision thereof, any consideration received by the owner for such lease shall not be deemed a charge within the meaning of this section.

" 'Section 7. Nothing in this act shall be construed to:

" '(a) Create a duty of care or ground of liability for injury to persons or property.

" '(b) Relieve any person using the land of another for recreational purposes from any obligation which he may have in the absence of this act to exercise care in his use of such land and in his activities thereon, or from the legal consequences of failure to employ such care.

" 'Section 8. [Insert effective date.]' 24 Council of State Governments, 'Public Recreation on Private Lands: Limitations on Liability,' Suggested State Legislation (1965) pp. 150–52." *Scrapchansky* v. *Plainfield*, supra, 226 Conn. 463–64 n.2 (*Katz, J.*, dissenting).

[7] "Public Acts 1967, No. 623." *Scrapchansky* v. *Plainfield*, supra, 226 Conn. 464 n.3 (*Katz, J.*, dissenting).

normally would have under the common law. The Department of Agriculture feels that this would greatly increase the open space use throughout the state of Connecticut.' 12 H.R. Proc., Pt. 9, 1967 Sess., p. 4254, remarks of Representative Bernard Avcollie. 'It will for the most part in my opinion do something that many of us who live in the rural areas have for a long time wanted. . . . Within a very short driving distance of every major city in this state there are vast areas of land that could be used for recreational purposes and the only thing in the path standing in the way, the only thing which has prevented the owners from allowing use of their land for recreational purposes has been the possible liability which they would incur if people using it for recreational purposes were injured on their land. [T]his is the target point of this bill. To say to any landowner if you register your land for recreational purposes and those who come on are injured again through no fault of yours, the owner, then you will not be liable. I think the state of Connecticut and a large percentage certainly of the urban population are going to benefit under this bill, it relieves the state of the necessity for purchasing, it relieves the state of the necessity for maintaining land that could very well serve for picnicking, for hiking, for horseback riding and for many other recreational activities which, because of lack of faith in the urban areas is very limited at the present time.' 12 H.R. Proc., Pt. 9, 1967 Sess., pp. 4255–56, remarks of Representative Robert King. 'A review of the legislative history reveals that the clear purpose of § 52-557g is an attempt to satisfy the public's need for recreational and open space by encouraging *private land owners*, through limiting their liability, to open their land to public use.' . . . *Genco* v. *Connecticut Light & Power Co.*, [supra, 7 Conn. App. 168–69].

"Connecticut passed the Recreational Land Use Act in 1971. Without published comment, the legislature

repealed §§ 23-27a through 23-27k of title 23, entitled 'Parks, Forests and Public Shade Trees,' and enacted §§ 52-557f through 52-557i in its place. Public Acts 1971, No. 249. The philosophy behind the legislation was again made clear—to make the option of opening private land for public recreational use more attractive.[8] Representative David Lavine, one of the primary sponsors of the act, in his remarks before the House of Representatives, clearly contrasted land owned by private individuals with that owned by federal, state and municipal bodies. 'We should realize, though, that neither federal, state [nor] local implementation of recreational plans are going to require or set aside enough land for the recreational needs of our citizens. For certain and many types of outdoor activities such as hiking, hunting, fishing, enjoyment of the rural life in Connecticut, we have long depended and will continue to depend upon the generosity of private owners of land and water to open their property to the use and enjoyment of their

---

[8] "Connecticut's statute, like those of many other states, had its genesis in the model act. G. Thompson & M. Dettmer, [supra, 61 Mich. B.J. 726]. The introductory statement of the reasons for the model act is therefore entitled to consideration. The preamble provides: 'Recent years have seen a growing awareness of the need for additional recreational areas to serve the general public. The acquisition and operation of outdoor recreational facilities by governmental units is on the increase. However, large acreages of private land could add to the outdoor recreation resources available. . . . [I]n those instances where private owners are willing to make their land available to members of the general public without charge, it is possible to argue that every reasonable encouragement should be given to them.

" 'In something less than one-third of the states, legislation has been enacted limiting the liability of private owners who make their premises available for one or more public recreational uses. This is done on the theory that it is not reasonable to expect such owners to undergo the risks of liability for injury to persons and property attendant upon the use of their land by strangers from whom the accommodating owner receives no compensation or other favor in return.

" 'The suggested act which follows is designed to encourage availability of private lands . . . .' 24 Council of State Governments, 'Public Recreation on Private Lands: Limitations on Liability,' Suggested State Legislation (1965) p. 150." *Scrapchansky* v. *Plainfield*, supra, 226 Conn. 466 n.4 (*Katz, J.*, dissenting).

fellow citizens.' 14 H.R. Proc., Pt. 4, 1971 Sess., pp. 1804–1805. Representative Lavine's comments were echoed by several other legislators. Senator Romeo Petroni noted that 'it is an important bill and . . . it will have I think the positive [e]ffect as far as people who own private lands opening them up for recreation . . . .' 14 S. Proc., Pt. 4, 1971 Sess., p. 1679.

"The act helped to make the option of opening private land for public recreational use more viable by decreasing liability to landowners and decreasing costs to governmental entities seeking to provide recreational lands. Absent the exercise of its right of condemnation, the government is powerless to compel private landowners to open their property for recreational use. Moreover, budget deficits limiting governments' ability to invest in recreational lands sufficient to satisfy the ever increasing demand effectively eliminated even this option. The act furnished a solution. '[T]his would open up land in the state of Connecticut at no cost to the state, town or federal government at all.' 14 H.R. Proc., Pt. 4, 1971 Sess., p. 1809, remarks of Representative Peter F. Locke, Jr.[9]

"As stated, this act sought to increase the availability of recreational lands by limiting liability for accidents occurring on the property. Landowners are protected in two ways from liability for injuries suffered by entrants. When a landowner directly or indirectly invites another to use his property for a recreational purpose without fees, the entrant does not thereby become a licensee or invitee. General Statutes § 52-557g. The landowner 'owes no duty of care to keep the land, or the part thereof so made available, safe for entry or use by others

---

[9] "It was also remarked before the Senate that 'this is an important bill. And will probably do more to open up land to recreation purposes without the expenditure of a single penny on the part of the state.' 14 S. Proc., Pt. 4, 1971 Sess., p. 1679, remarks of Senator Roger W. Eddy." *Scrapchansky* v. *Plainfield*, supra, 226 Conn. 467 n.5 (*Katz, J.*, dissenting).

for recreational purposes, or to give any warning of a dangerous condition, use, structure or activity on the land to persons entering for recreational purposes.' General Statutes § 52-557g (a). Historically, the common law places a successively greater duty on the landowner to visitors, depending on whether the visitor is a trespasser, a licensee, or an invitee. *Morin* v. *Bell Court Condominium Assn., Inc.*, 223 Conn. 323, 327–28, 612 A.2d 1197 (1992). The act drastically alters these principles. Except where there is consideration; General Statutes § 52-557h; the act fundamentally changes the law by shifting the burden of liability for injuries from the land occupier, who may be in a better position to prevent accidents, to the entrant, regardless of his or her classification at common law, who may be powerless to avoid them. This fundamental change is consistent with the underlying objective of the legislation to encourage free use of land. The act reflects the judgment of the legislature that the public benefit of attracting private landowners to allow their land to be used outweighs the risk of potential injuries.

"The inherent costs to society that can result from removing the caretaking responsibilities and duty to warn against known or discoverable hazards imposed upon public landowners at common law, however, are not outweighed by any benefit conferred upon society by the act. Public lands are lands already held open to the public." (Emphasis in original.) *Scrapchansky* v. *Plainfield*, supra, 226 Conn. 462–68. (*Katz, J.*, dissenting). Municipalities provide recreational land as part of their traditional function. *National League of Cities* v. *Usery*, 426 U.S. 833, 851, 96 S. Ct. 2465, 49 L. Ed. 2d 245 (1976), overruled on other grounds, 469 U.S. 528, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985). Because they are in the business of providing parks, pools, ball fields, etcetera, the legislature had less incentive to dangle the carrot of immunity to encourage municipali-

ties to do what they historically have always done. The cost benefit calculation that immunity was necessary to further the goal of opening private land to recreation has less application to publicly owned recreational facilities, which are, by definition, already available to the public. Moreover, although municipal immunity *could* reduce cost to municipalities, which in turn would enable municipalities to purchase and maintain more land, in the absence of a clear intent to abrogate the common law, we will not indulge this speculative benefit.[10]

There are other compelling reasons why, in the absence of explicit direction from the legislature, this court should not read the term "owner" to include municipalities. "At common law a municipality was generally immune from liability for its tortious acts. *Ryszkiewicz* v. *New Britain*, 193 Conn. 589, 593, 479 A.2d 793 (1984). Its employees had a qualified immunity in the performance of a governmental duty. If an employee misperformed a ministerial act, he was potentially liable; if, however, he misperformed a discretionary act, he was immune from liability subject to three exceptions. *Evon* v. *Andrews*, 211 Conn. 501, 505, 559 A.2d 1131 (1989). General Statutes § 52-557n, enacted as part of tort reform in 1986; Public Acts 1986, No. 86-338, § 13; was 'intended, in a general sense, both to codify and to limit municipal liability . . . .' *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 188, 592 A.2d 912 (1991). In 1971, when the act was enacted; Public Acts 1971, No. 249; as well as in 1967, immunity for municipalities was alive and well. Accordingly, there was even less incentive to craft the act in order to grant

---

[10] Because immunity conferred by § 52-557g is in derogation of the common law, it should be strictly construed to effectuate its intended purpose; *McKinley* v. *Musshorn*, 185 Conn. 616, 621, 441 A.2d 600 (1981); and "is to be limited to matters clearly brought within its scope." *Willoughby* v. *New Haven*, 123 Conn. 446, 454, 197 A. 85 (1937).

immunity to an entity that was already protected in order to supplement available recreational land."[11] *Scrapchansky* v. *Plainfield,* supra, 226 Conn. 469 n.7 (*Katz, J.,* dissenting).

The legislature was not contemplating immunity for governmental entities. At the time the act was enacted, the legislature was interested in increasing the availability of land for public recreational use. See 12 H.R. Proc., Pt. 9, 1967 Sess., pp. 4255–56. Consequently, municipalities would have had to identify additional land and pay large sums to purchase and maintain it in order to accomplish that goal had the legislation not succeeded. The legislature's sole motive was to encourage private citizens to donate their land as an alternative to this costly enterprise. There is no indication that the legislature was seeking to permit a municipality to have immunity for responsibilities arising out of property that it already owned.

We reject the defendants' argument that *Manning* was correctly decided, on the theory that the statutory immunity attaches only to public land made available without charge, and that the legislature rationally drew a distinction between free public facilities and those that citizens must pay to use.[12] This rationale ignores

---

[11] "We have often stated that we will not assume the legislature enacted legislation that serves no useful purpose. *Hartford Electric Light Co.* v. *Water Resources Commission,* 162 Conn. 89, 99, 291 A.2d 721 (1971); *Anthony* v. *Administrator,* 158 Conn. 556, 565, 265 A.2d 61 (1969). Furthermore, if a statute is susceptible to an interpretation by which such a consequence can be avoided, that interpretation will be found. *Hartford Electric Light Co.* v. *Water Resources Commission,* supra [99]." *Scrapchansky* v. *Plainfield,* supra, 226 Conn. 469 n.7 (*Katz, J.,* dissenting).

[12] The defendants also urge this court to follow the Appellate Court opinion in *Drisdelle* v. *Hartford,* 3 Conn. App. 343, 345–46, 488 A.2d 465, cert. denied, 196 Conn. 801, 491 A.2d 1104 (1985), wherein that court held that a municipality was a landowner as defined within General Statutes § 52-557j, which limits the liability of landowners for injuries sustained by snowmobilers riding on their lands. Although that decision is not binding on this court and we take no position as to its propriety, we note that §§ 52-557j

reality. Municipalities make land available through taxes, which in effect constitute an implicit "charge" for the use of the land. If taxes do indeed constitute a "charge," the municipality is stripped of immunity. See General Statutes §§ 52-557g and 52-557h. Taxes play another role in this area. By providing immunity to private landowners, the statute shifts the burden from the otherwise liable landowner to the injured citizen on the theory that the public will benefit from having more recreational land available. Where a municipality is the landowner, however, this balance shifts because, through taxes, municipalities are able to spread costs among residents and thereby shift the burden of negligence away from the injured citizen. Because municipalities essentially pass on the costs for all recreational facilities or services to the citizenry in the form of taxes, providing them with immunity would be at best anomalous.

In conclusion, "[t]here is nothing in the legislative history to suggest that the legislature intended or even contemplated that the act would provide immunity for governmental entities. Therefore, to apply the act to municipalities imposes too high a societal cost and serves no useful or intelligible purpose." *Scrapchansky* v. *Plainfield*, supra, 226 Conn. 468–69 (*Katz, J.*, dissenting). "The protection granted through the act was an incentive for private owners to open up new lands for public use. It was not an attempt to provide an immunity shield for existing state or municipal recreational areas." Id., 470. In the absence of any express legislative provision covering publicly owned lands, we decline to read the statute to extend the immunity

and 52-557g serve different purposes: § 52-557g offers immunity as an incentive for private landowners to open up their land to free public use, while the purpose of § 52-557j is to immunize landowners from liability to snowmobilers regardless of whether their land is open to the public for recreational use and regardless of whether the owner even knows that others are using its land. See 14 H.R. Proc., Pt. 8, 1971 Sess., p. 3544.

beyond private landowners. For states that have express legislation affording immunity to municipalities, see, e.g., Ala. Code §§ 35-15-20 through 35-15-28 (1991 & Sup. 1995); Ariz. Rev. Stat. Ann. § 33-1551 (Sup. 1995); Colo. Rev. Stat. Ann. §§ 33-41-102 through 33-41-105 (1995); Idaho Code § 36-1604 (1994); Ill. Ann. Stat. c. 745, 10/3-106 (Smith-Hurd 1993); Ind. Code Ann. § 14-22-10-2 (Burns 1995); Me. Rev. Stat. Ann. tit. 14, § 8104-A (West Sup. 1995); Mo. Rev. Stat. §§ 537.345 through 537.348 (1994); Mont. Code Ann. § 70-16-302 (1995); N.H. Rev. Stat. Ann. § 212:34 (1989) and § 508:14 (1983 and Sup. 1995); N.D. Cent. Code §§ 53-08-01 through 53-08-06 (1989 and Sup. 1995); S.D. Codified Laws Ann. §§ 9-38-55 and 9-38-105 (1995); Tenn. Code Ann. §§ 70-7-101 through 70-7-104 (1995); Utah Code Ann. §§ 57-14-1 through 57-14-7 (1994); Va. Code Ann. § 15.1-291 (Michie Sup. 1995); Wash. Rev. Code § 4-24-210 (1988 and Sup. 1996); Wis. Stat. Ann. § 895.52 (West Sup. 1995).[13]

---

[13] We note that four states explicitly exclude public entities from their recreational land use statutes. See Haw. Rev. Stat. §§ 520-1 through 520-3 (1993); Iowa Code §§ 461C.1 through 461C.7 (Sup. 1996); Minn. Stat. §§ 604A.21 through 604A.25 (Sup. 1996); N.C. Gen. Stat. §§ 38A-1 through 38A-2 (1995). We further note that ten states have judicially extended the immunity under their recreational land use statutes to public entities; see, e.g., *Stone Mountain Memorial Assn.* v. *Herrington*, 225 Ga. 746, 171 S.E.2d 521 (1969); *Page* v. *Louisville*, 722 S.W.2d 60 (Ky. App. 1986); *Anderson* v. *Springfield*, 406 Mass. 632, 549 N.E.2d 1127 (1990); *Matthews* v. *Detroit*, 141 Mich. App. 712, 367 N.W.2d 440 (1985); *Watson* v. *Omaha*, 209 Neb. 835, 312 N.W.2d 256 (1981); *Trimblett* v. *State*, 156 N.J. Super. 291, 383 A.2d 1146 (1977); *Johnson* v. *New London*, 36 Ohio St. 3d 60, 521 N.E.2d 793 (1988); *Hughey* v. *Grand River Dam Authority*, 897 P.2d 1138 (Okla. 1995); *Hogg* v. *Clatsop County*, 46 Or. App. 129, 610 P.2d 1248 (1980); *Commonwealth* v. *Auresto*, 511 Pa. 73, 511 A.2d 815 (1986); and four states have judicially excluded public entities from the immunity provided by their recreational land use statutes. See, e.g., *Delta Farms Reclamation District* v. *Superior Court*, 33 Cal. 3d 699, 660 P.2d 1168, 190 Cal. Rptr. 494, cert. denied, 464 U.S. 915, 104 S. Ct. 277, 78 L. Ed. 2d 257 (1983); *Pensacola* v. *Stamm*, 448 So. 2d 39 (Fla. Dist. Ct. App. 1984); *Ferres* v. *New Rochelle*, 68 N.Y.2d 446, 510 N.Y.S.2d 57, 502 N.E.2d 972 (1986); *Stamper* v. *Board of Education*, 191 W. Va. 297, 445 S.E.2d 238 (1994).

"Aware that neither reason nor authority in the law 'offers the slightest encouragement to the notion that time petrifies into unchanging jurisprudence a palpable fallacy'; see *Flagiello* v. *Pennsylvania Hospital*, 417 Pa. 486, 511, 208 A.2d 193 (1965); our reexamination, we submit, has been thorough and sound." *White* v. *Burns*, supra, 213 Conn. 336. We have determined that the challenged precedent involves "fallacy." Our decision that we should not overrule precedent unless cogent reason and inescapable logic require it has particular force when the precedent involved concerns the interpretation or construction of a statute. *Pouch* v. *Prudential Ins. Co. of America*, 204 N.Y. 281, 287, 97 N.E. 731 (1912). There may well be precedent nevertheless that, when challenged and reexamined, mandates that "[j]udicial honesty dictates corrective action." *Olin Mathieson Chemical Corp.* v. *White Cross Stores, Inc.*, 414 Pa. 95, 100, 199 A.2d 266 (1964). This appeal presents such a case.

Our reexamination of *Manning* persuades us that its analytical underpinnings are flawed. What we viewed once as clear and unambiguous language—the statutory definition of "owner"—is not, despite its superficial unambiguity. Furthermore, *Manning* ignores the legislative history, including not only the statements made on the floor of the Senate and the House of Representatives when it was passed, but the origin of the statute in the model act. A careful and comprehensive reading of that history, however, evinces a clear legislative intent that "owner," despite the breadth of its statutory definition, means private, not municipal, fee owners.

Furthermore, as a result of *Manning*, which misinterpreted the act, some litigants have not had the days in court to which they were entitled, and of which the legislature never intended to deprive them. Leaving the decision in *Manning* in place would mean that future litigants, including those who might, in reliance on *Man-*

*ning*, forgo making otherwise valid claims, will be similarly disadvantaged. Because this state of affairs is the result of our mistake, it is better that we remedy it now.

Finally, we note that, in the present case, as in most unintentional tort cases, there is no reason to suppose that the defendants planned their conduct with the intention of availing themselves of the benefits of recent law. See *O'Connor* v. *O'Connor*, supra, 201 Conn. 645. Under such circumstances, reliance is not a consideration. Furthermore, there is no argument made, nor does the record support the argument, that municipalities decided not to purchase liability insurance in reliance on *Manning*. We think it unlikely that, in the four years since we decided *Manning*, municipalities have ordered their affairs, by structuring either their liability insurance or self-insuring protection, based on an immunity arising only out of the use of free parks or other municipal recreational facilities. We conclude, therefore, for all the aforestated reasons, that *Manning* was not correctly decided and that, consequently, that decision and its progeny must be overruled.

After we interpret a statute, the legislature will often act in response. See, e.g., *State* v. *Blasko*, 202 Conn. 541, 558, 522 A.2d 753 (1987). Had the legislature, after our decision in *Manning*, expressed a view that established definitively the meaning of the term "owner" in § 52-557f (3), that view would , of course, be honored. *Bell* v. *New Jersey*, 461 U.S. 773, 784, 103 S. Ct. 2187, 76 L. Ed. 2d 312 (1983).[14]

---

[14] The town argues that to overrule *Manning* would constitute a violation of article second of the Connecticut constitution, as amended by article eighteenth of the amendments, which provides in relevant part: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." We disagree. The municipal immunity the defendants seek to preserve stems from a judicially crafted interpretation of the term "owner." For all the aforestated reasons, that interpretation was incorrect. The legisla-

In this case, however, the legislature failed to amend the statute after our decision in *Manning*. Although we have looked to legislative inaction following a decision as a signal of acquiescence in the holding of the court; see, e.g., *Ralston Purina Co.* v. *Board of Tax Review*, 203 Conn. 425, 439, 525 A.2d 91 (1987); we have more recently questioned the use of the legislative acquiescence rule as a tool by which to divine legislative intent. See, e.g., *Streitweiser* v. *Middlesex Mutual Assurance Co.*, 219 Conn. 371, 379, 593 A.2d 498 (1991); *Greenwich* v. *Dept. of Public Utility Control*, 219 Conn. 121, 127–28 n.6, 592 A.2d 372 (1991). The United States Supreme Court has been particularly critical of the use of the legislative acquiescence doctrine as a measure of accuracy of a court's interpretation of a statute. See *Aaron* v. *Securities & Exchange Commission*, 446 U.S. 680, 694 n.11, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980) ("failure of Congress to overturn . . . interpretation falls far short of providing a basis to support a construction of § 10 (b) [of the Securities Exchange Act of 1934]"); see also *Red Lion Broadcasting Co.* v. *Federal Communications Commission*, 395 U.S. 367, 381–82 n.11, 89 S. Ct. 1794, 23 L. Ed. 2d 371 (1969) ("unsuccessful attempts at legislation are not the best of guides to legislative intent"). We have even frowned at the use of legislative inaction regarding one section of a statute as a reliable indicator of legislative intent when the legislature has undertaken to amend other sections of the same statute. *Streitweiser* v. *Middlesex Mutual Assurance Co.*, supra, 379 (despite having undertaken on several occasions to amend General Statutes § 38-175c, failure of legislature to change rulings of this court that term "uninsured

ture that passed the act never articulated the need for municipal immunity to ensure adequate public recreational facilities. Its sole focus was on private landowners. This court acts well within its powers when it disavows its earlier interpretation without significantly interfering with the orderly conduct of the essential functions of another branch of government. See *Bartholomew* v. *Schweizer*, 217 Conn. 671, 676, 587 A.2d 1014 (1991).

motorist" was not intended to include hit-and-run operators did not impliedly incorporate those rulings into statute); but see *Cappellino* v. *Cheshire*, 226 Conn. 569, 576, 628 A.2d 595 (1993).

In this case, since *Manning*, four bills have been introduced by the legislature to amend the act. In 1993, House Bill No. 6634 was introduced to remove explicitly municipalities and their employees from the definition of "owner" in § 52-557f (3). Although the House Judiciary Committee favorably reported the bill out of committee (approved by a 32 to 0 vote), the full legislature never voted on this bill. In 1994, the judiciary committee voted in favor of two bills, House Bill No. 5700, approved by a 30 to 1 vote, and Substitute House Bill No. 5532, approved by a 21 to 1 vote, that would have amended § 52-557h, the "exceptions" provision of the act, making municipalities liable "for the creation or maintenance of a dangerous structure or failure to guard or warn against a dangerous structure that is the sole proximate cause of an injury." Substitute House Bill No. 5532, § 2, File No. 587. Finally, in 1995, Raised Bill No. 1014 proposed an amendment to § 52-557f to exclude explicitly municipalities from the definition of "owner"; however, there is no indication in the legislative record why that bill never made it out of committee.

The defendants would like us to conclude, on the basis of these failed attempts to amend explicitly the act, that the interpretation of "owner" given by this court in *Manning* was indeed approved by the legislature. The plaintiff argues that, in light of the judiciary committee's recommendation and overwhelming support for the elimination of municipal immunity, on three separate occasions, it is unreasonable to view the legislature as acting in approval or acquiescence of *Manning*. "[W]e are reluctant to draw inferences regarding legislative intent from the failure of a legislative committee to report a bill to the floor, because in most cases

the reasons for that lack of action remain unexpressed and thus obscured in the midst of committee inactivity." *In re Valerie D.*, 223 Conn. 492, 518 n.19, 613 A.2d 748 (1992).[15] Rather than draw inferences from the judiciary committee's decision to recommend the amendments or, conversely, draw inferences from the failure of the bill to reach the floor of either chamber, we conclude that the four years' worth of silence is not sufficiently unambiguous and longstanding to overcome the other sound reasons for our conclusion to overrule *Manning*.

Accordingly, we now hold that municipalities are not "owners" within the act. Therefore, the trial court improperly rendered summary judgment against the plaintiff.[16]

## II

In light of our resolution of the first question, we do not answer the second question on which we granted certification.

This court, in phrasing the questions for certification, limited its review to whether *Manning* should be overruled and, if *Manning* is not overruled, whether the association owed a duty to the plaintiff separate and apart from any duty it owed as an owner.[17] We neglected

[15] In *In re Valerie D.*, supra, 223 Conn. 517–26, we examined two proposed bills that took directly contrary approaches to the issue before the committee in question. Under those "limited circumstances . . . the committee's endorsement of one bill and rejection of the other, coupled with the legislature's passage of the bill endorsed by the committee, provide[d] a sufficient foundation for an inference regarding legislative intent." Id., 518 n.19.

[16] Because the town is not an "owner," neither the town, as the principal, nor Dixon, its parks department director, as its agent, is immune by virtue of the act. To hold otherwise would "completely bypass" the act. *Manning* v. *Barenz*, supra, 221 Conn. 262.

[17] With respect to the second certified question, the plaintiff claims that even if the association is an "owner" within the meaning of the act based upon its control over the property during the tournament and its responsibilities as an "owner" to inspect the courts and to ascertain and remedy any dangerous conditions, the association also had a legal duty separate and apart from its responsibilities as an owner to make a reasonable site selec-

to ask what duty the association would owe if *Manning* is indeed overruled, thereby stripping the town of its immunity, and concomitantly, whether the association can nevertheless be an "owner" under the act even though it has not opened its property to the public. Although the Appellate Court concluded that the association was an "owner" under the act; *Conway* v. *Wilton,* supra, 39 Conn. App. 287; that decision was made in the context of our holding in *Manning,* which we have now overruled.

The judgment of the Appellate Court is reversed and the case with respect to the association is remanded to that court for consideration of whether the association is an "owner" under § 52-557f (3) in order to define the scope of the association's liability; the case with respect to the town and Dixon is remanded to the Appellate Court with direction to remand the case to the trial court for further proceedings according to law.

In this opinion BORDEN and PALMER, Js., concurred.

PETERS, C. J., with whom CALLAHAN, J., joins, dissenting. I disagree with the overruling of *Manning* v. *Barenz,* 221 Conn. 256, 603 A.2d 399 (1992), and therefore respectfully dissent.

In assessing the force of stare decisis, our case law has emphasized that we should be especially cautious about overturning a case that concerns statutory construction. In my view, the present case does not present

tion. See *Wagenblast* v. *Odessa School District,* 110 Wash. 2d 845, 852–56, 758 P.2d 968 (1988) (due to intimate relationship between interscholastic sports and other aspects of public education, school district owes duty of care to athletes engaged in interscholastic sports, which duty may delegate to private interscholastic activities association); see also *Carabba* v. *Anacortes School District,* 72 Wash. 2d 939, 435 P.2d 936 (1967).

sufficiently compelling reasons for disregarding this sound caution.

When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. Sometimes, when we have made such a determination, the legislature instructs us that we have misconstrued its intentions. We are bound by the instructions so provided. See, e.g., *Reliance Ins. Co.* v. *American Casualty Ins. Co.*, 238 Conn. 285, 291, 679 A.2d 925 (1996), and cases cited therein. More often, however, the legislature takes no further action to clarify its intentions. Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. See, e.g., *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities*, 236 Conn. 681, 693, 674 A.2d 1300 (1996); *Habetz* v. *Condon*, 224 Conn. 231, 239 n.12, 618 A.2d 501 (1992); *Farmers & Mechanics Savings Bank* v. *Garofalo*, 219 Conn. 810, 817, 595 A.2d 341 (1991); *Union Trust Co.* v. *Heggelund*, 219 Conn. 620, 626–27, 594 A.2d 464 (1991); *In re Jessica M.*, 217 Conn. 459, 472, 586 A.2d 597 (1991); *State* v. *Marsala*, 216 Conn. 150, 158, 579 A.2d 58 (1990); *White* v. *Burns*, 213 Conn. 307, 333–34, 567 A.2d 1195 (1990); *Phelps Dodge Copper Products Co.* v. *Groppo*, 204 Conn. 122, 134, 527 A.2d 672 (1987); *Ralston Purina Co.* v. *Board of Tax Review*, 203 Conn. 425, 439, 525 A.2d 91 (1987).

In light of our role as surrogates for the legislature, proper respect for the separation of powers has led us to exercise prudence with respect to the overruling of cases that involve the construction of a statute. Once an appropriate interval to permit legislative reconsider-

ation has passed without corrective legislative action,[1] the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision. "If . . . stare decisis is to continue to serve the cause of stability and certainty in the law—a condition indispensable to any well-ordered system of jurisprudence—a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. [W.] Maltbie, [Connecticut Appellate Procedure, 226]. This is especially true when the precedent involved concerns the interpretation or construction of a statute. . . . A change in the personnel of the court never furnishes reason to reopen a question of statutory interpretation." (Citations omitted.) *Herald Publishing Co.* v. *Bill*, 142 Conn. 53, 62, 111 A.2d 4 (1955); see *Neal* v. *United States*, 516 U.S. 284, 295, 116 S. Ct. 763, 133 L. Ed. 2d 709 (1996); *Patterson* v. *McLean Credit Union*, 491 U.S. 164, 172–73, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989); *Jolly, Inc.* v. *Zoning Board Of Appeals*, 237 Conn. 184, 196, 676 A.2d 831 (1996); *General Electric Employees Federal Credit Union* v. *Zakrzewski*, 235 Conn. 741, 744, 670 A.2d 274 (1996); see generally L. Marshall, " 'Let Congress Do It': The Case for an Absolute Rule of Statutory Stare Decisis," 88 Mich. L. Rev. 177 (1989)

---

[1] In this case, the record for legislative acquiescence in our decision in *Manning* v. *Barenz*, supra, 221 Conn. 256, is unusually strong because it does not depend on mere legislative silence. Testimony at hearings before the Joint Committee on the Judiciary in 1993, 1994 and 1995 informed the legislature of the competing positions of tort claimants and recreational facility providers with respect to *Manning*. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 1995 Sess., pp. 2025–38; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1995 Sess., pp. 1718–20, 1739, 1769; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1994 Sess., pp. 803–806, 822–32, 855–66, 888–99; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1993 Sess., pp. 1126–28, 1131–32, 1197–1203, 1238–39, 1289–92, 1414. Although the Judiciary Committee approved bills that would have changed the outcome in *Manning*, the legislature did not enact them. This record demonstrates, at the least, that the legislature was informed of the *Manning* decision and chose to take no further action in response thereto.

(arguing that separation of powers justifies heightened rule of stare decisis for precedents involving statutory construction).[2]

I am not persuaded that "the most cogent reasons and inescapable logic" compel us to overrule *Manning*. Municipalities, like private landowners, make choices about charging user fees for recreational facilities. Municipalities, like private landowners, must insure, or take the risk of acting as self-insurers, if they face exposure for injuries suffered by recreational users. Municipalities are not, prima facie, excluded from the category of land "owners." The public policy advanced by the Connecticut Recreational Land Use Act (act), General Statutes § 52-557f et seq., is, therefore, neither undermined nor disserved by including municipalities within its ambit.

It is important to bear in mind that the issue before us is not whether a sound argument can be advanced in favor of construing the term "owner," for the purposes of this act, in the manner advocated by the majority. That was the issue in *Manning*, but it is not the issue in this case. Due regard for the high threshold of "the most cogent reasons and inescapable logic" requires more.

The general authorities on which the majority relies do not address the high threshold required to overrule

[2] The highest courts of our sister states have also applied a heightened standard when considering whether to overturn precedent involving the construction of a statute. See, e.g., *In re Speer*, 53 Idaho 293, 299–300, 23 P.2d 239 (1933); *Samsel* v. *Wheeler Transport Services, Inc.*, 246 Kan. 336, 356–57, 789 P.2d 541 (1990), overruled on other grounds, *Bair* v. *Peck*, 248 Kan. 824, 844, 811 P.2d 1176 (1991); *Geier* v. *Mercantile-Safe Deposit & Trust Co.*, 273 Md. 102, 124, 328 A.2d 311 (1974); *Kansas City Public Service Co.* v. *Ranson*, 328 Mo. 524, 536–37, 41 S.W.2d 169 (1931); *Bottomly* v. *Ford*, 117 Mont. 160, 167–68, 157 P.2d 108 (1945); *Jensen* v. *Labor Council*, 68 Nev. 269, 280–81, 229 P.2d 908 (1951); *Higby* v. *Mahoney*, 48 N.Y.2d 15, 18–19, 396 N.E.2d 183, 421 N.Y.S.2d 35 (1979); *People* v. *Hobson*, 39 N.Y.2d 479, 488–90, 348 N.E.2d 894, 384 N.Y.S.2d 419 (1976); *In re Burtt's Estate*,

a precedent that concerns the interpretation or construction of a statute. The scholarly authorities and the federal cases principally address the virtues of consistency in constitutional law in which, by hypothesis, legislative acquiescence is irrelevant. See *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833, 854–55, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992); C. Peters, "Foolish Consistency: On Equality, Integrity, and Justice in Stare Decisis," 105 Yale L. J. 2031 (1996). In our own recent cases in which we have departed from common law precedents, we have changed common law rules, sometimes to conform the common law to a changed statutory landscape; see, e.g., *Bohan* v. *Last*, 236 Conn. 670, 680, 674 A.2d 839 (1996); *Fahy* v. *Fahy*, 227 Conn. 505, 513–16, 630 A.2d 1328 (1993); sometimes to recognize changed circumstances generally; see, e.g., *State* v. *Troupe*, 237 Conn. 284, 300–303, 677 A.2d 917 (1996); *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, 236 Conn. 362, 370–73, 672 A.2d 939 (1996); but those cases do not justify departure from established statutory constructions. In constitutional and in common law cases, we have plenary authority to decide whether a prior precedent produces results that now seem "unjust."[3] It is precisely because

353 Pa. 217, 231–32, 44 A.2d 670 (1945); *Powers* v. *Powers*, 239 S.C. 423, 427, 123 S.E.2d 646 (1962).

[3] The United States Supreme Court has determined that the standard for stare decisis for precedents involving statutory construction is more stringent because the power of the legislative branch is implicated. See *California* v. *Federal Energy Regulatory Commission*, 495 U.S. 490, 499, 110 S. Ct. 2024, 109 L. Ed. 2d 474 (1990) ("considerations of stare decisis have special force in the area of statutory interpretations, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done"); see also *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, supra, 505 U.S. 854–55 (in constitutional jurisprudence, stare decisis is informed by prudential and pragmatic considerations); C. Peters, supra, 105 Yale L. J. 2114–15 (justifying stare decisis based on consequentialist considerations, and noting that "in statutory interpretation, fragmented case law would frustrate the very purpose of having a statute in the first place").

we lack such plenary authority when the legislature has made the underlying policy decision, and has acquiesced in our interpretation of what that policy decision encompasses, that a higher threshold pertains.

The specific argument advanced by the majority for concluding that this threshold has been met is that, in light of the act's legislative history, its use of the term "owner" requires a construction that differs from that which we adopted in *Manning*. For three reasons, this argument is unpersuasive. First, although the legislative history suggests that our earlier reading of "owner" may have been overinclusive, it falls far short of demonstrating that the holding of *Manning* was so ill considered or has been shown to have such dire consequences that "inescapable logic" requires its overruling. Second, the majority underestimates the likelihood of municipal reliance on the holding in *Manning*. What is at stake is the construction of statutory language, textually unchanged, the meaning of which is now to be altered retrospectively. The impact of a judicial construction of an established text more closely resembles the impact of judicial decisions affecting land titles, in which stare decisis has special importance; see *State Land Board* v. *Corvallis Sand & Gravel Co.*, 429 U.S. 363, 381, 97 S. Ct. 582, 50 L. Ed. 2d 550 (1977); *Ozyck* v. *D'Atri*, 206 Conn. 473, 483, 538 A.2d 697 (1988) (*Healey, J.,* concurring); than that of judicial decisions involving idiosyncratic testamentary dispositions. *Hartford National Bank & Trust Co.* v. *Harvey*, 143 Conn. 233, 243, 121 A.2d 276 (1956). Third, in deciding that justice demands that *Manning* be overruled, the majority overlooks the reasoning of cases such as *Florestal* v. *Government Employees Ins. Co.*, 236 Conn. 299, 309–10, 673 A.2d 474 (1996), and cases cited therein, in which we have repeatedly held that disappointed claimants must look to the legislature, and not to the courts, for redress from statutory unfairness.

There appear to be few cases in which, notwithstanding the principles of stare decisis and of separation of powers, this court has concluded that it should overrule a prior precedent of statutory construction. The majority cites only *Chairman* v. *Freedom of Information Commission*, 217 Conn. 193, 201, 585 A.2d 96 (1991), but that case is distinguishable. In *Chairman*, we held that our prior case law had misconstrued the exemption provision contained in General Statutes § 1-19 (b) (2) of the Freedom of Information Act by interpolating into the act a balancing test for which there was no textual basis. Id., 200–201. Although § 1-19 (b) *(1)* expressly provides a balancing test, § 1-19 (b) *(2)* does not. Id., 200. The inescapable logic of this textual distinction was a compelling basis for departing from stare decisis that this case does not provide. My own research has found no other such compelling examples.

I respectfully dissent.