MMI INVESTMENTS, LLC *v.* EASTERN COMPANY

EASTERN COMPANY *v.* MMI INVESTMENTS, LLC

| Superior Court | Judicial District of Waterbury | File Nos. CV960134473 CV960134839 |
|---|---|---|

Memorandum filed December 3, 1996

*Day, Berry & Howard,* for the plaintiff in the first case and for the defendant in the second case.

*Gager & Peterson,* for the defendant in the first case and for the plaintiff in the second case.

## I

## INTRODUCTION

FINEBERG, J. These two actions have been consolidated for trial. In the first action, MMI Investments, LLC

(MMI), as party plaintiff, seeks, under General Statutes § 33-334 (c), a writ of mandamus commanding the defendant, Eastern Company (Eastern), to make its record of shareholders available to MMI for inspection and copying. In the second action, Eastern, as party plaintiff, seeks an injunction and declaratory judgment to prevent MMI, as party defendant, from calling, as authorized in General Statutes § 33-326 (c),[1] a special meeting of Eastern shareholders, on the ground of alleged noncompliance with the statutory requirements for the calling of such a special meeting.

The parties filed "Joint Stipulations of Fact and Law," dated October 2, 1996. The trial lasted three days, October 2 through 4, 1996. In addition, the parties filed extensive pretrial memoranda. The parties stipulated on the record that all evidence presented at trial would apply to both actions.

MMI is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Millbrook, New York. It was formed in January, 1996, as a vehicle to buy and to sell securities. MMI is exclusively managed by Millbrook Capital Management, Incorporated (Millbrook), a New York corporation with its principal place of business in Millbrook, New York. MMI's principal business is the management of investments in public and private companies.

Eastern is a Connecticut corporation with its principal office in Naugatuck. It manufactures various products. Other than a small facility in New Britain, Eastern's

---

[1] General Statutes §§ 33-326 (c) and 33-334 (c) are part of the Connecticut Stock Corporation Act, General Statutes §§ 33-282 through 33-418, inclusive. Public Acts 1994, No. 94-186, § 214, repealed this act effective January 1, 1997. On that date a new act, the Connecticut Business Corporation Act, General Statutes §§ 33-600 through 33-998, inclusive, as amended by Public Acts 1996, No. 96-271, will take effect.

manufacturing facilities are located outside of Connecticut. It has plants in Ohio, Illinois, New York, Ontario and Taiwan. Of its approximately 500 employees, somewhat in excess of fifty are employed at the New Britain plant, and about a dozen at its Naugatuck headquarters. Eastern's shares are publicly traded on the American Stock Exchange.

As of the date of trial, there were issued and outstanding 2,699,284 shares of Eastern common stock, its only class of stock. MMI on the trial date was the record holder of 178,400 shares of Eastern common stock. At the time in August, 1996, when it commenced the present mandamus action, MMI was the record holder of 1000 such shares, the bulk of its shares being held in street name.

On July 16, 1996 Millbrook made an offer to purchase for $15 per share all the issued and outstanding shares of Eastern common stock pursuant to a merger of Eastern into a controlled affiliate of Millbrook (Millbrook proposal), subject to certain conditions set forth in the Millbrook proposal. On July 25, 1996, the board of directors of Eastern rejected the Millbrook proposal. On August 12, 1996, MMI, acting through its managing agent, Millbrook, requested Eastern to permit MMI access to Eastern's shareholder list. On August 14, 1996, Eastern rejected MMI's request. MMI then commenced the present mandamus action.[2]

On September 25, 1996, MMI submitted the request of shareholders together claiming to own in excess of one tenth of the voting power of all shares entitled to vote at a meeting of the shareholders of Eastern, that

[2] Actually, this is the third such action commenced against Eastern by MMI. The first two actions by complaints respectively dated July 31, 1996, and August 6, 1996, were withdrawn for technical reasons. In addition, the initial request for the Eastern shareholders list was made on July 25, 1996, by Millbrook which neither then nor at trial was an Eastern shareholder.

Eastern's president call a special meeting of shareholders for purposes set forth in this request.[3] Eastern has rejected this request on the ground that the statutory requirements for such a request or call have not been met. Eastern then commenced the present injunction and declaratory judgment action.[4]

These two actions will be reviewed in order. Material issues of first impression under the laws of this state are involved.

## II

### EXAMINATION OF RECORD OF SHAREHOLDERS

The first action, *MMI Investments, LLC* v. *Eastern Co.*, Docket No. CV960134473, concerns the right of MMI to the Eastern shareholders list. Before reviewing the applicable law, the court will first outline additional relevant facts.

The ostensible purpose for obtaining the list was stated by MMI in its operative August 12, 1996 request as follows: "The purpose for obtaining this list is to permit MMI to communicate with other shareholders, including the call of a special meeting of shareholders to discuss the [Millbrook] proposal to purchase all of the outstanding shares of Eastern at a substantial premium pursuant to an all-cash merger of Eastern into a controlled affiliate of [Millbrook]." The use of the list "to communicate" with the shareholders, including at a special meeting, concerning the Millbrook proposal is reiterated in its operative complaint.

On the surface, therefore, it would seem that the proposed communication use of the list, including with

---

[3] An identical request had been submitted by MMI on August 22, 1996, and rejected by Eastern on September 6, 1996.

[4] Eastern initially commenced the present action in response to the September 6, 1996 special meeting request, but amended its complaint to include the operative September 25, 1996 request. That request was formally rejected at trial.

regard to the calling of a special meeting of shareholders, would be merely for the dissemination of information about and discussion of the Millbrook proposal, but not for voting purposes. Such is not the case. The true purpose for obtaining the list was made evident both at trial and in the requests for the calling of a special meeting of shareholders. For example, the initial special meeting request, dated August 22, 1996, contains the request of a shareholder, Evelyn B. Spencer, dated August 14, 1996, the same date as that of Eastern's rejection of the shareholders list request dated two days earlier. It is reasonable to infer that the special meeting request was prepared and in being prior to receipt of the shareholders list rejection.

It is MMI's intention that this special meeting not be merely for information and discussion purposes, but, to take by vote, definitive and binding action in furtherance of the Millbrook proposal. The intended action set forth in its request includes the replacement of the present board of directors with a board favorable to Millbrook; bylaw amendments to enable the same; binding the corporation to the Millbrook proposal; and, in the alternative, if no merger has been consummated by December 31, 1996, declaration of a special dividend of $3 per share.[5] As of the time of trial, however, the requisite documentation to effect this action, including the form of necessary amendments to the certificate of incorporation and bylaws, the proposed merger agreement and plan of merger,[6] as well as the identity of the proposed replacement directors, was not in being.

The Millbrook proposal was elaborated upon at trial, primarily by MMI's witness Clay Lifflander. Lifflander

---

[5] Technically, the purpose stated in attachment A is to request the board of directors to declare the special dividend of $3 per share, but this must be read in the context of Millbrook's intention to control the board and to force approval of its merger proposal.

[6] See General Statutes §§ 33-364 to 33-371 regarding mergers.

is both a member of MMI and the president of Millbrook. Eastern is to be merged with an "acquisition subsidiary" of B.W. Elliott Manufacturing Company, Inc. (Elliott), a "controlled affiliate" of Millbrook located in Binghampton, New York. Elliott's acquisition subsidiary had not, as yet, been formed. The merger agreement when drafted would contain conditions and contingencies allowing the Elliott acquisition subsidiary to withdraw from the merger if it decided not to proceed.

The shares held by MMI would be treated differently from those of other Eastern shareholders. MMI would have the option either of accepting payment for its shares in the same manner as the other shareholders, or of participating in whole or in part as an equity holder in the merged enterprise, presumably under a formula not disclosed. According to Lifflander, the decision would be "driven by tax consequences."

Payment for the surrendered Eastern shares would be made after completion of the merger. The funds required for payment, however, will not be on hand prior to the merger, but are to be obtained from a lender through acquisition financing of the merger. This is not a tender offer. It is structured as a highly leveraged acquisition predicated on the loan value of the target company.

Approximately $40,000,000 will be required for payment of the surrendered shares alone, exclusive of closing costs, financing costs and related expenses.[7] Lifflander testified that the "current worth," as distinguished from net worth and book value, of Elliott was approximately $8,000,000. Elliott's present resources are obviously inadequate to support the needed financing. There was no indication, moreover, of whether or

---

[7] At $15 per share, payment for the 2,699,284 Eastern shares would amount to $40,489,200. The 178,400 shares held by MMI would account for $2,676,000 of that sum if all are surrendered.

to what extent, if any, Elliott or any of its affiliates or controlling parties, including Millbrook, would be obligated on the financing, or what investment, capital or otherwise, was to be made in the yet to be formed Elliott acquisition subsidiary. The financing, therefore, will be based primarily, if not exclusively, on the loan value of Eastern's assets and earnings. Eastern apparently is presently substantially debt free.

Lifflander was confident that the requisite financing was obtainable. No such financing has as yet been arranged. MMI introduced into evidence the proposal letter of what its counsel described as a large international banking corporation.[8] This appears to be only a preliminary draft containing boilerplate provisions and conditions, and expressly stating that it is not to be construed as an offer or a commitment. Apparently, the Millbrook group has not previously dealt with this lender.

General Statutes (Rev. to 1995) § 33-334 (c) provides that upon application of a shareholder of record, the court, subject to such limitations as it may prescribe, may, after notice and hearing, permit such shareholder or his agent or attorney to examine and make copies of various corporate records including the record of shareholders. General Statutes (Rev. to 1995) § 33-334 (c) further provides: "In the case of any application for examination under this subsection, the shareholder shall have the burden of showing that the examination is in good faith in the interest of such shareholder as such or of the corporation and not for speculative or trading purposes or any purpose inimical to the interest of the corporation or its shareholders."[9] The history of

---

[8] By agreement of the parties, the identity of this corporation was, for confidentiality reasons, redacted from the exhibit.

[9] The counterparts to General Statutes (Rev. to 1995) § 33-334 in the Business Corporation Act are General Statutes §§ 33-946 through 33-948, inclusive. Section 33-946 (c) provides: "A shareholder may inspect and copy the records described in subsection (b) of this section only if: (1) His demand

this statute and its predecessors, as it relates to the rights of a shareholder to examine stock records, is set forth in *State ex rel. Sirica* v. *Quatrano*, 14 Conn. Sup. 161 (1946). *State ex rel. Sirica* involved a statute substantially the same in substance as § 33-334 (c).

At common law, the right of inspection of the books and records of a corporation at reasonable times and for a proper purpose was a privilege incident to the ownership of shares in a corporation. *State ex rel. Costelo* v. *Middlesex Banking Co.*, 87 Conn. 483, 484–85, 88 A. 861 (1913). That common-law right was not absolute, but was "qualified by the condition, among others, that the purpose of the stockholder desiring to make the examination is germane to his interest as such stockholder, proper and lawful in its character, and not inimical to the interests of the corporation itself." Id., 485. The statute in effect at the time of *State ex rel. Costelo* changed the common law with respect to stock records by making the theretofore qualified right absolute. Nevertheless, the court in *State ex rel. Costelo* examined the shareholder's purpose in requesting inspection, on the ground that the requisite writ of mandamus would not issue unless the request therefor were "made in good faith and not to serve an ulterior improper purpose." Id., 488. In affirming the issuance of the writ, the court held that the writ would not be refused merely because the information was sought for use in the applicant's own business of a stockbroker and trader, or to sell to other stockbrokers throughout the country as a list of possible investors. Id., 489. Perhaps in delayed reaction to this ruling, the statute was changed in 1927 in relevant part to substantially its present form, codifying the common law qualified right referred to in *State ex rel. Costelo*, with the addition of the "speculative or

---

is made in good faith and for a proper purpose; (2) he describes with reasonable particularity his purpose and the records he desires to inspect; and (3) the records are directly connected with his purpose."

trading purposes" prohibition. Connecticut cases concerning the post-1927 statute are sparse, none on the appellate level.

*State ex rel. Sirica* held that the writ must disclose on its face a clear right to the relief demanded, sustaining a motion to quash a writ that failed to state any purpose for the requested inspection. *Brecker* v. *Nielsen*, 21 Conn. Sup. 33, 36, 143 A.2d 463 (1958), sustained a demurrer to a writ brought by beneficiaries of a trust seeking inspection of stock records of a corporation whose stock was an asset of the trust, on the ground that the right extends only to record shareholders.[10] *Knibbs* v. *Knibbs Construction, Inc.*, 25 Conn. Sup. 253, 256–57, 202 A.2d 248 (1964), dismissed an action brought by application on the jurisdictional ground of noncompliance with the requirements for bringing a mandamus action.

*DeRosa* v. *Terry Steam Turbine Co.*, 26 Conn. Sup. 131, 214 A.2d 684 (1965), involved an analogous statute, General Statutes § 33-333 (a), which provides that a list of the shareholders of a corporation shall, prior to shareholders meetings " 'be subject to inspection by any shareholder . . . for any proper purpose in the interest of the shareholder as such or of the corporation and not for speculative or trading purposes or for any purpose inimical to the interest of the corporation or of its shareholders.' " Id., 135–36. The plaintiffs were employees of the defendant corporation, and members of a labor union in the midst of a labor dispute with

---

[10] This limitation of the inspection right to shareholders of record has been modified by the Business Corporation Act. Section 33-946 of the act concerns inspection of records by shareholders. Subsection (f) thereof provides that for purposes of this section, " 'shareholder' includes a beneficial owner whose shares are held in a voting trust or by a nominee on his behalf." See also the definition of "shareholder" set forth in General Statutes § 33-602 (25), which includes "the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation."

the defendant. Id., 132. Each plaintiff owned one share of stock, paid for by the union, which received the dividends. Id. Their purpose for obtaining the shareholders list was to enable their union to communicate with the shareholders regarding the defendant's labor relations, and to inform the shareholders of employee dissatisfaction with the defendant's labor policies. Id., 137. Inspection was allowed, the court stating that it could not find that the purpose for inspection was not proper or was inimical to the interest of the corporation or its shareholders. Id., 139. In addition, the court held that it did not matter that the plaintiffs were acting for the union, because a registered shareholder acting for the beneficial owner is not precluded from inspecting the list of shareholders. Id., 141.

Under § 33-334 (c), in order for a court to compel a corporation to permit inspection of its record of shareholders, the shareholder seeking such inspection bears the burden of proof of the following: (1) that the request is made in good faith in the interest of such shareholder as such or of the corporation; and (2) not for speculative or trading purposes; or (3) for any purpose inimical to the interest of the corporation or its shareholders. *State ex rel. Sirica* v. *Quatrano*, supra, 14 Conn. Sup. 163. In view of the paucity of case law in Connecticut on these issues, the court may look to other jurisdictions for guidance.

In some jurisdictions, a shareholder is entitled to examine the record of shareholders for any "proper purpose." Del. Code tit. 8, § 220 (b) (1991); *General Time Corp.* v. *Talley Industries, Inc.*, 240 A.2d 755 (Del. 1968). Under the Delaware statute, a proper purpose is defined as "a purpose reasonably related to [the stockholder's] interest as a stockholder." (Internal quotation marks omitted.) *General Time Corp.* v. *Talley Industries, Inc.*, supra, 755. The Connecticut statute is analogous to the Delaware standard in that it focuses on

the stockholder's interest as a stockholder. Section 33-334 (c) provides that the shareholder's examination of the record must be "in the interest of *such shareholder as such* . . . ." (Emphasis added.)

The Delaware statute has been interpreted to take into account the interests of the corporation. "However, even though the purpose may be proper in the sense that it is reasonably related to the person's interest as a stockholder, it must also not be adverse to the interests of the corporation. To this extent a stockholder's right of inspection is a qualified right depending upon the facts of the particular case." *Skoglund* v. *Ormand Industries, Inc.*, 372 A.2d 204, 207 (Del. Ch. 1976). The Delaware "proper purpose" rule as so interpreted parallels the common-law rule embodied in § 33-334 (c). Delaware cases and cases from other jurisdictions employing the proper purpose rule are appropriate guides to interpretation of the Connecticut statute. Delaware, however, distinguishes in the burden of proof between requests for inspection of stock ledgers and requests for inspection of other types of corporate books and records. With respect to stock ledgers, the burden of proof is on the corporation to establish that such inspection is sought for an improper purpose; while with respect to other types of corporate books and records, the requesting shareholder must first establish that he seeks inspection for a proper purpose. Id. Applying these standards, the court in *Skoglund* approved a request for inspection of stock ledgers and other types of records for the purpose of investigating possible mismanagement, and ruled that an ulterior motive to gain control of the corporation was not sufficient to show either overriding bad faith or a threat to the business interests of the corporation. Id., 214.

In *E.L. Bruce Co.* v. *State*, 51 Del. 252, 253, 144 A.2d 533 (1958), a group of stockholders requested to examine E.L. Bruce Company's record of shareholders to

"solicit support for their slate of directors at the forth-coming stockholders' meeting . . . or to attempt to buy additional stock from the other stockholders, or both." The court held that "[i]nspection of the stock ledger to solicit proxies at the stockholders' meeting is obviously proper; and an intention to purchase additional shares from other stockholders is likewise proper." Id., 253–54.

The court in *Mite Corp.* v. *Heli-Coil Corp.*, 256 A.2d 855 (Del. Ch. 1969), applied the law set forth in *E.L. Bruce Co.* to a corporate takeover situation. Heli-Coil Corporation was a takeover target for the Mite Corporation. Id., 856. The Mite Corporation desired Heli-Coil Corporation's list of stockholders "to solicit offers from other Heli-Coil's stockholders to exchange their stock for stock of Mite." Id. Heli-Coil Corporation argued that Mite Corporation's purpose for demanding the list was improper because the Securities Exchange Commission (SEC) had not yet approved Mite Corporation's registration statement and because Mite Corporation purchased its shares solely for the purpose of demanding the list. Id. The court held that "absence of approval by the SEC" is irrelevant in determining whether Mite Corporation sought the list for a proper purpose. Id. The court then stated that "inspection of a stock list is proper where it is sought in order to purchase additional shares of a company's stock from other stockholders." Id. Furthermore, according to the court, Mite Corporation's purpose was "not made improper because the first shares were purchased as a prelude to a demand for the list." Id. The court held that Mite Corporation possessed a proper purpose in requesting the list and, therefore, compelled Heli-Coil Corporation to provide the list to the Mite Corporation. Id. Heli-Coil Corporation also made a counterclaim demanding Mite Corporation's list of stockholders. Id., 857. The court noted that Heli-Coil Corporation became a record stockholder in

Mite Corporation and made demand for inspection of its list of stockholders " 'for the purpose of communicating with other stockholders of MITE Corporation in connection with the Exchange Offer to be submitted for approval at a special meeting of MITE Corporation's stockholders . . . .' " Id. Mite Corporation argued that Heli-Coil's demand for the list was improper because the demand was just a defense tactic "purposefully made to frustrate the proposed tender offer to stockholders of the company." Id. The court noted that "if a plaintiff establishes *a* proper purpose then all others are irrelevant." (Emphasis in original.) Id., 858. According to the court, "Heli-Coil's purpose is to communicate with other stockholders of Mite in connection with the exchange offer to be submitted for stockholder approval. That is a purpose reasonably related to Heli-Coil's interest as a Mite stockholder. The proposed exchange offer is a matter of corporate concern and any stockholder is entitled to take the side he prefers and to seek support from fellow stockholders." Id. The court then stated that "[a]ny other purpose Heli-Coil has . . . is not relevant." Id. Accordingly, the court allowed Heli-Coil Corporation to inspect Mite Corporation's list of stockholders. Id.

In New York, a stockholder is permitted to inspect the stockholder list for a proper purpose. *Crane Co.* v. *Anaconda Co.*, 39 N.Y.2d 14, 18, 346 N.E.2d 507, 382 N.Y.S.2d 707 (1976). In *Crane Co.*, the court held that "[a] shareholder desiring to discuss relevant aspects of a tender offer should be granted access to the shareholder list unless it is sought for a purpose inimical to the corporation or its stockholders . . . ." Id., 17; accord *Johncamp Realty* v. *Sanders*, 98 Misc. 2d 949, 415 N.Y.S.2d 192 (1979).

Crane, a stockholder in Anaconda, desired Anaconda's list of shareholders so that Crane could communicate with the other shareholders about Crane's offer to

"exchange up to 100 million dollars in subordinated debentures for as many as 5 million shares of common stock of . . . Anaconda . . . ." *Crane Co.* v. *Anaconda Co.*, supra, 39 N.Y.2d 15. Additionally, Crane wanted the shareholder list to solicit tenders of stock from Anaconda's other shareholders. Id., 17.

Anaconda denied inspection of the list because it believed that Crane did not possess a proper purpose in requesting the inspection. Id., 16. Anaconda contended "that inspection should not be compelled where the stockholder desires to obtain the identity of other stockholders to convince them to sell their stock, since this does not involve the business of the corporation." Id., 20. According to Anaconda, "a 'proper purpose' should be determined with respect to the corporation and not in light of the interest to all the shareholders in relation to their stock holding." Id.

The court stated that the corporation has the burden of justifying its refusal "by showing an improper purpose or bad faith." Id. According to the court, since the pendency of Crane's exchange offer "may well affect not only the future direction of the corporation but the continued vitality of the shareholders' investment, inspection of the stock book should be allowed so that qualified shareholders may have the means to independently evaluate the situation." Id., 21. The court further stated that "[a]n extant tender offer or abandoned tender offer, or for that matter a successful tender offer, may have dramatic impact on the value of the corporate stock. Consequently, shareholders should be apprised of all aspects surrounding a tender offer." Id., 22. Accordingly, the court held that Crane possessed a proper purpose in requesting inspection of the list. Id., 24.

In the present case, MMI desires the list of Eastern shareholders in furtherance of its takeover merger proposal. Under the rationale of *Crane Co.*, Eastern's shareholders nonetheless should be apprised of the merger

proposal since it may have a direct impact on the value of Eastern stock, and, as a result, the proposal would directly impact the shareholders' interests as shareholders. In fact, Lifflander testified that after Millbrook made the merger proposal known to the public, Eastern's stock price rose in value. The court in *Mite Corp.* v. *Heli-Coil Corp.*, supra, 256 A.2d 858, stated that takeover offers are matters "of corporate concern and any stockholder is entitled to take the side he prefers and to seek support from fellow stockholders."

Courts in other jurisdictions have permitted inspection of lists of shareholders for similar takeover, stock related or control purposes. See, e.g., *Hanrahan* v. *Puget Sound Power & Light Co.*, 332 Mass. 586, 126 N.E.2d 499 (1955); *Nationwide Corp.* v. *Northwestern National Life Ins. Co.*, 251 Minn. 255, 87 N.W.2d 671 (1958); *Celina Mutual Ins. Co.* v. *American Druggists Ins. Co.*, 52 Ohio App. 2d 304, 369 N.E.2d 1066 (1977); *Bundy* v. *Robbins & Myers, Inc.*, 38 Ohio Op. 77, 75 N.E.2d 717 (1947).

Eastern asserts that MMI is seeking the list for Millbrook and, therefore, MMI is not requesting the list for its own interests as a stockholder. In *Trans World Airlines, Inc.* v. *State*, 54 Del. 582, 585, 183 A.2d 174 (1962), a stockholder requested inspection of the stockholder list for another party who was not a record stockholder. The court stated that this fact alone does not defeat the stockholder's right to demand the list. Id. This ruling accords with Connecticut law as expressed in *DeRosa* v. *Terry Steam Turbine Co.*, supra, 26 Conn. Sup. 138. Although Millbrook may benefit from MMI's efforts, MMI and the other Eastern shareholders may also benefit from the merger.

Eastern further asserts that MMI seeks the shareholders list for trading or speculative purposes. A similar assertion was addressed in *Bundy* v. *Robbins & Myers,*

*Inc.*, supra, 38 Ohio Op. 77. In permitting access to the shareholders list, the court stated: "Manifestly, a great number of investors in stocks could likewise be properly so charged. Indeed, it is probable that the majority of investors in common stock are engaged in a speculative venture. We are of opinion that this alone is not a valid reason to preclude a stockholder from an inspection of the records of his corporation." *Id.*, 81. The court concluded, however, that the list should be refused where it appears that the stockholder desires it for "purely speculative purposes." *Id.*, 82. The evidence in the present case demonstrates that MMI desires the list in furtherance of the Millbrook merger proposal. While MMI does have an investment interest in Eastern and in the merger proposal, that interest does not rise to the level of being purely for trading or speculative purposes.

According to Eastern, MMI's request to inspect the stockholder list is inimical to Eastern and Eastern's shareholders because MMI has not complied with various SEC rules concerning shareholder solicitations. Alleged violation of SEC rules, however, will not defeat a stockholder's demand to inspect the stockholders list once a proper purpose is established. *General Time Corp.* v. *Talley Industries, Inc.*, supra, 240 A.2d 756; see also *Kerkorian* v. *Western Air Lines, Inc.*, 253 A.2d 221, 225 (Del. Ch. 1969) (holding that alleged violations of Federal Aviation Act of 1958 are irrelevant with respect to propriety of shareholder's purpose).

Eastern also contends that MMI has not acted in good faith because MMI and Millbrook have always desired acquiring Eastern despite their original disclosure to the SEC that they originally purchased shares in Eastern for investment purposes. "There is nothing unlawful about attempting to gain control of a corporation by lawful means. . . . A stockholder has the right as against the corporation and other stockholders to gain control of the corporation by lawful means such as by

stock purchases and stock control." (Internal quotation marks omitted.) *Nationwide Corp.* v. *Northwestern National Life Ins. Co.*, supra, 251 Minn. 264. Accordingly, even if MMI desired control of Eastern from the start, there is nothing unlawful about that purpose and Eastern does not cite any cases that state the contrary.

*Shabshelowitz* v. *Fall River Gas Co.*, 412 Mass. 259, 588 N.E.2d 630 (1992), relied upon by Eastern, is inapposite. *Shabshelowitz* held that the proper purpose test did not apply under the corporation laws of Massachusetts. The relevant statute provided that a stockholder is entitled to examine the list of stockholders so long as the stockholder would not be "using the [list] for a purpose other than in the interest of the applicant, as a stockholder, relative to the affairs of the corporation." Id., 262 n.5, quoting Mass. Gen. Laws c. 156B, § 32 (1992).[11] The court rejected application of the proper purpose test since the common law in Massachusetts only permitted inspection of the stockholder list if the request was "motivated by the purposes of advancing the corporation's interest." (Internal quotation marks omitted.) *Shabshelowitz* v. *Fall River Gas Co.*, supra, 265. Furthermore, the court stated that although courts in other states applied the proper purpose test to their statutes, "the statutes interpreted by those courts appear to emphasize the personal interest of the stockholder and do not contain [Massachusetts'] statutory language referring to the interest of the applicant, as a stockholder, relative to the affairs of the corporation." (Internal quotation marks omitted.) Id., citing Del. Code Ann. tit. 8, § 220 (b) (1983). The shareholder's purpose "was to learn the identity of Company stockholders in

[11] Mass. Gen. Laws c. 156B, § 32 (1992) provides in pertinent part: "[I]t shall be a defense that the actual purpose and reason for the inspection sought are to secure a list of stockholders . . . for the purpose of selling said list or information or copies thereof or of using the same for a purpose other than in the interest of the applicant, as a stockholder, relative to the affairs of the corporation."

order to determine whether there were stockholders willing to sell their Company shares to him." (Internal quotation marks omitted.) *Shabshelowitz* v. *Fall River Gas Co.*, supra, 260. He was found to be motivated solely by personal investment concerns. It is doubtful whether the request in *Shabshelowitz* would pass muster under the present Connecticut statute.

In the present case, the true purpose of the MMI request, made on behalf of Millbrook, is that set forth in its demand for the call of a special shareholders meeting. This evinces a motivation to bind Eastern to the Millbrook merger proposal without Millbrook or its designated affiliate being similarly bound. Admittedly, Millbrook through MMI is attempting to lay on a heavy hand. The court, however, cannot usurp the role of Eastern's shareholders. The decision is theirs.

The right of a shareholder to examine the corporation's list of shareholders for a proper purpose is to be liberally construed. Eastern has cited no case where the request in the context of a takeover or tender offer has been denied. The cases are to the contrary. The court is therefore constrained to find that MMI has sustained its burden of proof under § 33-334 (c). In so finding, the court is influenced by its ruling, infra, on the second action regarding the special meeting demand.

### III

### SPECIAL MEETING OF SHAREHOLDERS

The second action, *Eastern Co.* v. *MMI Investments, LLC*, Docket No. CV960134839, concerns the request submitted by MMI for the call of a special meeting of shareholders as authorized by General Statutes (Rev. to 1995) § 33-326 (c). Section 33-326 (c) provides in pertinent part: "Upon the written request of the holders of not less than one-tenth of the voting power of all shares entitled to vote at the meeting, the president shall

call a special shareholders' meeting for the purposes specified in such request and cause notice thereof to be given, *except that if the corporation has a class of voting stock registered pursuant to Section 12 of the Securities Exchange Act of 1934,*[12] *as the same has been or hereafter may be amended from time to time, and no person held ten per cent or more of the voting power of all shares of the corporation on February 1, 1988, the president need not call such meeting except upon the written request of the holders of not less than thirty-five per cent of such voting power.* If the president shall not, within fifteen days after the receipt of such shareholders' request, so call such meeting, such shareholders may call the same."[13] (Emphasis added.) In 1988, the legislature amended § 33-326 (c) by adding to it the provisions emphasized above. Public Acts 1988, No. 88-350, §§ 5 and 7. The operative request submitted by MMI was made by qualified shareholders holding 270,996 shares, an amount slightly in excess of the one-tenth threshold.

The issue is whether on February 1, 1988, any person held 10 percent or more of the voting power of all shares entitled to vote. If so, the requesting shareholders have satisfied the statutory 10 percent participation requirement. If not, they have not done so, as not less than 35 percent participation is required. There is no stock ledger or list showing the record holdings of Eastern stock as of February 1, 1988. The parties have agreed, however, that the number of 956,366 shares of Eastern common stock outstanding on February 26, 1988, applies to February 1, 1988. Each share of common stock has one vote.

---

[12] 15 U.S.C. § 78*l* (1988).

[13] The corresponding requirement in the Business Corporation Act, General Statutes § 33-696 (a), is substantially the same in that it retains the provisions emphasized above.

MMI contends that two entities each held over 10 percent of Eastern voting stock on February 1, 1988. On that date Colonial Bank (now Bank of Boston) held 95,750 shares as trustee under two separate Eastern employee pension plan trusts.[14] Together the shares held by these two trusts amount to slightly in excess of 10 percent of the shares then outstanding. Separately, each trust held only 5 percent of the then outstanding shares. In addition, on February 1, 1988, Cede and Company was the record holder of 419,654 shares, amounting to 43 percent of the shares then outstanding. Eastern disputes that either holding satisfies the statutory requirement.[15]

### A

### Colonial Bank, Trustee

"Where a person is a trustee of two distinct trusts, he must keep the funds and the application thereof separate . . . even though the corpus of each fund is finally to be paid to the same party." (Internal quotation marks omitted.) *Harris Trust & Savings Bank* v. *Wanner*, 326 Ill. App. 307, 61 N.E.2d 860, 865 (1944). "The trustee is under a duty to the beneficiary to keep the trust property separate from his individual property, and, so far as it is reasonable that he should do so, to keep it separate from other property not subject to the trust, and to see that the property is designated as property of the trust." 2 Restatement (Second), Trusts § 179 (1959). "It is ordinarily the duty of the trustee not to mingle property held upon one trust with property

---

[14] Apparently, Colonial Bank held a total of 170,241 shares in various fiduciary capacities. MMI has focused on these 95,750 pension plan trust shares, and makes no claim regarding the balance. The court's ruling, infra, would apply to all shares held by Colonial Bank in a fiduciary capacity.

[15] Eastern further contends that the purposes set forth in the special meeting request are inadequate or improper. Although this claim has merit, the issue is moot in view of the court's ruling, infra, on MMI's claims of compliance with the requirements of § 33-326 (c).

held upon another trust, whether the two trusts are created by separate settlors or by the same settlor." Id., § 179, comment (c). "It is the duty of trustees holding two distinct trust funds to segregate them." (Internal quotation marks omitted.) *Heaton* v. *Bartlett*, 87 N.H. 357, 363, 180 A. 244 (1935). These statements are consistent with Connecticut law. "The trustees of a fund have a duty to protect it. . . . They hold legal title to that fund . . . and they must be loyal to it." (Citations omitted.) *Palmer* v. *Hartford National Bank & Trust Co.*, 160 Conn. 415, 425, 279 A.2d 726 (1971).

A fiduciary acting in its capacity as such has an identity separate and apart from its individual identity. In *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, 145 Conn. 222, 224–25, 140 A.2d 863 (1958), the issue was whether the defendant bank, through employees of its trust department, was engaged in the unauthorized practice of law. The court distinguished between acts and practices by the defendant bank when acting primarily for itself, and those when acting in performance of its fiduciary capacity. Id., 229. The former, which included disseminating general information concerning the application, scope and effect of various laws and in reviewing wills and trust agreements in the course of obtaining or holding trust department customers, was held not to constitute the unauthorized practice of law; while the latter, to the extent that the acts performed "were such as are 'commonly understood to be the practice of law,' " would so constitute the unauthorized practice of law. Id., 236.

In addition, each trust is, in effect, a separate entity. In furtherance of this concept, General Statutes § 36a-352 (a) provides: "All investments held by or in the custody of a bank as a fiduciary shall, except as otherwise provided by law or unless the contrary is expressly permitted by the instrument or court order creating the

fiduciary relationship, be segregated and not mingled with other assets of such bank or with the assets of any other fiduciary account, and shall, except as provided in subsection (b) of this section or as otherwise provided in the instrument or the court order creating the fiduciary relationship, be held so as to set forth clearly the fiduciary capacity in which such bank is acting." The evidence demonstrates that Colonial Bank was the trustee of two distinct trust funds. Colonial Bank held 47,775 shares as trustee for the Eastern Company pension plan for hourly rated employees and 47,975 shares as trustee for the Eastern Company pension plan for salaried employees. According to the two proxy statements offered by MMI, Colonial Bank voted the shares of each trust separately. As trustee of both trusts, Colonial Bank could not combine the corpus of both trusts and hold it as a single unit, as Colonial Bank was not a person holding 10 percent of Eastern's voting stock on February 1, 1988, for purposes of § 33-326 (c).

## B

### Cede and Company

MMI next contends that Cede and Company qualifies as a person holding 10 percent or more of Eastern voting stock by reason of the 419,654 shares registered in its name, amounting to 43 percent of the outstanding stock. The parties have stipulated to the following: (1) Cede and Company was the agent for the Depository Trust Company, a clearing agency established under § 17 (a) of the federal Securities Exchange Act of 1934. Brokers, banks and other financial institutions use the Depository Trust Company or another clearing agency as a nominee to hold shares in order to facilitate clearance and settlement of transfers of stock among participants in the depository without the transfer of stock certificates. Cede and Company does not generally vote the shares of stock held of record in its name. Instead, it

grants an "omnibus proxy" pursuant to which each financial institution for which the Depository Trust Company holds shares of a corporation directs the vote of such shares. Cede and Company provides a securities position statement to the corporation indicating how many shares each entity is entitled to vote pursuant to the omnibus proxy; (2) the 419,654 shares owned of record by Cede and Company in 1988 were not, in fact, voted by Cede and Company. Instead, the shares were voted pursuant to an omnibus proxy granted by Cede and Company to the brokerage houses and financial institutions holding Eastern shares through the Depository Trust Company; and (3) all shares of Eastern registered in the name Cede and Company that were voted in 1988 were voted pursuant to the omnibus proxy from Cede and Company.

The court received and accepts the testimony of Arthur Crozier concerning Cede and Company's stock holdings. Crozier is the managing director for Georgeson and Company, a proxy solicitation and investor relations company. According to Crozier, he is familiar with the manner in "which brokers and other financial institutions typically hold their shares in publicly traded corporations." Crozier testified that many retail customers who purchase stock and "who [do not] hold their shares registered on the books of the corporation . . . hold it in the name of their broker." Crozier then stated that "the bank or the broker is a custodian holder of those shares [and] they in turn are participants in a company called a depository trust company and they have book entry positions at [the] Depository Trust Company. Depository Trust Company in turn holds the shares for those banks and brokers on the books of the corporation." According to Crozier, the shares "usually appear in the name of Cede and Company, which is a partnership that's a nominee for Depository Trust Company."

Crozier then testified about the reason for holding stock through a depository trust company. According to Crozier, during the 1960s the volume of trading increased "to such a level that trying to do it through transferring stock certificates was simply not working anymore." The Depository Trust Company was developed "as a way to speed the processing of stock transfers since they could do the transfers by book entry registrations between the individual participants at Depository Trust Company and not have to execute new certificates each time there was a buy or a sell." Crozier testified that he is familiar with the stock ownership of several hundred corporations and that 70 to 90 percent of each corporation's stock is registered in the name of Cede and Company. Furthermore, Crozier stated that he was not aware of any publicly traded corporation that "has fewer than 10 percent of its shares held of record by [Cede and Company] or some similar depository."

Eastern contends that although Cede and Company held over 40 percent of Eastern's voting stock on February 1, 1988, Cede and Company should not be considered a person who "held 10 percent or more of the voting power of all shares of the corporation on February 1, 1988." Eastern asserts that to do so would render the statute a nullity, since depository trust companies, such as Cede and Company, held over 10 percent of a corporation's stock in most publicly traded corporations.

"Where the words of a statute fail to indicate clearly whether the provision applies in certain circumstances . . . such statutory interpretation is undertaken in light of the statute's purpose, its legislative history and the circumstances surrounding its enactment as well as its language." *Board of Trustees* v. *Freedom of Information Commission*, 181 Conn. 544, 550, 436 A.2d 266 (1980). "The words of a statute should be interpreted

in their natural and usual meaning unless such reading would defeat a legislative intent which becomes evident when the statute is read in the light of its history and purpose . . . even though such construction may seem contrary to the letter of the statute." *Royce* v. *Heneage*, 170 Conn. 387, 392, 365 A.2d 1109 (1976). "A statute should not be interpreted in any way to thwart its purpose . . . and that [i]n construing a statute, common sense must be used and courts will assume that [the legislature intended to accomplish] a reasonable and rational result." (Citations omitted; internal quotation marks omitted.) *Caltabiano* v. *Planning & Zoning Commission*, 211 Conn. 662, 667, 560 A.2d 975 (1989).

The statutory provision in issue setting the 35 percent voting power threshold requirement in the event that no one person held 10 percent or more thereof on February 1, 1988, was added to General Statutes § 33-326 (c) by Public Acts 1988, No. 88-350, §§ 5 and 7. This provision is unique to Connecticut. There apparently is no similar provision in the statutes of any other jurisdiction.

"When application of the statute to a particular situation reveals a latent ambiguity in seemingly unambiguous language . . . we turn for guidance to the purpose of the statute and its legislative history to resolve that ambiguity." (Internal quotation marks omitted.) *Conway* v. *Wilton*, 238 Conn. 653, 665, 680 A.2d 242 (1996). "We begin to ascertain the legislative intent by examining the statute in the context of the particular social problems it seeks to address. Identifying the societal problems which the legislature sought to address may be particularly helpful in determining the true meaning of the statute." (Internal quotation marks omitted.) Id., 665–66.

The legislative history of Public Acts 1988, No. 88-350, reveals the legislature's reasoning in adding this

restrictive provision to § 33-326 (c). While commenting on the bill, then Senator Richard Blumenthal stated that "[t]he purpose of this bill is to prevent hostile takeovers and protect corporations from them." 31 S. Proc., Pt. 7, 1988 Sess., p. 2440. Blumenthal further observed that the bill "does assure that many of the harmful effects of business combinations, acquisitions, tender offers, liquidations around the State of Connecticut and around the Country will not continue in our State. Such acquisitions in the past have cost us jobs, as assets [are] liquidated so as to pay off the debt that's incurred by the raiders. . . . This bill is designed to prevent those negative effects and it does so . . . by prohibiting business combinations between an interested shareholder, defined as anyone having control or indirect ownership or direct ownership of 10% or more of the stock in the company from 5 years after the date that that ownership of stock was acquired." Id., pp. 2242–43.[16]

The legislature understood that some investors purchased shares of stock while relying on the wording of the pre-1988 version of § 33-326, which allowed holders of only 10 percent of the voting stock to call a special shareholders meeting. According to Blumenthal, the 1988 amendment protects a shareholder's right to compel the call of such a meeting if that *"interested shareholder* has become one before February 1, 1988 and therefore has had no notice of this particular law or at least has bought into that statute before this law was even on our docket." (Emphasis added.) Id., p. 2443.

Cede and Company is not an investor. It is nothing more than a nominee for the convenience of others. It is a tool used by the stock market to facilitate and make more efficient trading in the shares of publicly held

---

[16] Public Acts 1988, No. 88-350, also added General Statutes § 33-313 (e), relating to factors to be considered by the directors in considering a proposed merger or sale of all assets, and General Statutes § 33-374e, relating to business combinations with interested shareholders.

companies. To interpret § 33-326 (c) in the manner advocated by MMI, the purpose of the added restriction in the statute of addressing the perceived social problems caused by hostile takeovers would be thwarted. Such an interpretation prevents the statute from ameliorating "the societal problems which the legislature sought to address . . . ." *Conway* v. *Wilton*, supra, 238 Conn. 656. Because of the incidence of record ownership by depository trust companies such as Cede and Company, the 1988 amendment would effectively be a nullity.

The court is "bound to assume that the legislature intended, in enacting a particular law, to achieve its purpose in a manner which is both effective and constitutional." *Moscone* v. *Manson*, 185 Conn. 124, 128, 440 A.2d 848 (1981). Consistent with the purpose of the 1988 amendment, the court rules that on the basis of the evidence presented, Cede and Company is not a "person" within the meaning of § 33-326 (c).

As no person held 10 percent or more of the voting power of all of the shares of Eastern on February 1, 1988, the written request of the holders of not less than 35 percent of such voting power was required. The subject request submitted by MMI for the call of a special meeting of Eastern shareholders fails to comply with this requirements, and accordingly is invalid.

C

Relief Requested

Eastern seeks relief by way of declaratory judgment and an injunction. Both are proper. The parties have stipulated that "[t]here is a justiciable controversy ripe for determination by this court." The existence or nonexistence of a right is at issue. Practice Book § 389. The parties have further stipulated that all persons who

joined in the special meeting request have been provided reasonable notice of this action. Practice Book § 390 (d) has thus been complied with. MMI's contention that all other Eastern shareholders are "interested persons" entitled to notice is without merit. See *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 224–28, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997). A declaratory judgment action may be accompanied by a claim for coercive relief. Practice Book § 391 (c).

Injunctive relief is appropriate. It is obvious that Eastern has established irreparable harm and, has no adequate remedy at law.

## IV

## JUDGMENT

## A

### *MMI Investments, LLC* v. *Eastern Co.*

In the action entitled *MMI Investments, LLC* v. *Eastern Co.*, Docket No. CV960134473, it is hereby adjudged and ordered that the defendant, Eastern, permit the plaintiff, MMI, in person or by agent or attorney, to inspect and to make copies and extracts of Eastern's record of shareholders as of the most recent date available, including to the extent in being and available, Eastern's stock ledger or list, in whatever form it is maintained, showing the name and address of each shareholder and the number of shares registered in the name of each shareholder as of the most recent date available; a magnetic computer tape list of the shareholders of Eastern, by class and series, as of the most recent date available, showing the name, address and number of shares held by each shareholder; such computer processing data as are necessary to make use of such magnetic computer tape; and a printout of such magnetic computer tape for verification purposes.

Eastern, by its agents, representatives and employees, shall render all necessary and reasonable cooperation to MMI in connection herewith.

The permission granted to MMI by this order shall be exercised by or on behalf of MMI by, and if not so exercised shall expire on, the date sixty days next after the date of the entry of this order.

B

*Eastern Co.* v. *MMI Investments, LLC*

In the action entitled *Eastern Co.* v. *MMI Investments, LLC*, Docket No. CV960134839, the court finds the issues in favor of the plaintiff, Eastern, and against the defendant, MMI, and enters judgment in favor of Eastern.

MMI is hereby enjoined from calling a special meeting of the shareholders of Eastern by reason of or in connection with any request for the call of the same heretofore submitted or made by or on behalf of MMI.

C

Costs

No costs are granted to or against any party to these actions.

D

Retention of Jurisdiction

The court retains jurisdiction in connection with the enforcement of these judgments and orders, and in connection with any disputes or controversies concerning or arising out of the same.